### B. F. McDonough v. First National Bank of Houston.

Plaintiff sued a National Bank on the following written promise to him—
   " Houston, January 20, 1866. Sir: We hereby agree to give you, by transfer, three thousand dollars in the stock of the First National Bank

of Houston, when fully organized ; also the sum of five thousand dollars, currency, whenever the bank may be in operation, which shall be with as little delay as possible. This is in consideration of expenditures and services already rendered to the institution. (Signed,) Yours truly, J. S. Roberts, Com., First National Bank, Houston." The defendant was not organized as a bank under the laws of the United States, until some two months after the date of this instrument; but the plaintiff averred a consideration moving to the defendant, and consisting of plaintiff's services and outlays in effecting its organization; and further averred that the defendant, after its organization as a bank, had ratified and adopted the promise sued on, by paying plaintiff part of the amount and by exercising and enjoying the banking privileges obtained by plaintiff's services and expenditures. The defendant demurred to the petition, and the court below sustained the demurrer. *Held*, that it was error to sustain the demurrer ; for, although the promise sued on was not the contract of the bank, unless adopted by it after its organization, and unless supported by a sufficient consideration, yet as the plaintiff averred such adoption and consideration, his petition alleged a good cause of action, and the liability of the bank depends upon questions of fact, to be determined by a jury.

APPEAL from Harris. Tried below before the Hon. James Masterson.

The facts of this case, so far as they are involved in the demurrer or necessary to an understanding of the opinion, are believed to be fully comprehended, though greatly condensed, in the head note— with the exception of the causes of demurrer assigned by the defendant. But as these causes are clearly disclosed in the arguments of the counsel, there is no occasion to insert them here. Looking to the several important questions thus raised, it will be seen that the opinion of the court, though brief, is of much more significance than it might otherwise seem; in view of which fact, and of the novelty of the case, at least in this State, it is deemed well to present the able arguments of counsel at greater length than would otherwise be allowable.

Besides its demurrer, the defendant filed answers, denying the services of the plaintiff, or that it was organized under the charter

solicited by him, or that it had, by partial payment or otherwise, ratified or adopted the promise sued on; but these answers, of course, are not germane to the case as now presented.

*McConaughey & Fauntleroy,* for the plaintiff in error.—The petition and amendments together contain the following allegations of fact:

That the plaintiff made application at the treasury department at Washington, for the privilege of establishing a national bank at Houston, Texas, under the law regulating banking; and did all that was necessary in such application.   The department, or proper officer, received the application, granted the privilege asked, and thereby decided the application to be legal and proper; and the same was *res adjudicata,* and not open to controversy in this suit.

The plaintiff, by means of his application, obtained the privilege of establishing a national bank at Houston, and had a reasonable time within which to procure the necessary subscribers, or get up the required amount of stock, and proceeded to Houston for the purpose of carrying the scheme into effect.   Here he found the moneyed men of Houston anxious to do the same thing, and desired to have the matter in their own hands, and under their own exclusive control.   A conflict of interest was at once apparent.   Conferences and negotiations ensued, and the result was that I. S. Roberts, for himself, and other commissioners or projectors (the men who wished to organize the bank), executed and delivered to the plaintiff the contract or obligation sued on, in consideration that he would waive or surrender his privilege, and allow them to take his place; in other words, that he would get out of their way.   In good faith, the plaintiff showed the department that he had given up his privilege, and was not averse to Roberts and others, by signing the subsequent applications, and acting in concert with the others, and afterwards co-operating with Muter Miller, the regular and confidential agent, at the instance and request of the defendant;

said Miller representing plaintiff's successors in the necessary preliminary proceedings at Washington.

The work of Roberts and others completed the organization of the bank under the law; and the petition not only states, generally, that the bank ratified the contract aforesaid, but distinctly alleges that it ratified the same by making a part payment to plaintiff, and by receiving and enjoying the fruits, benefits, and advantages derived from said contract.

We say, this sets forth a good cause of action.

The first exception is, that the contract was made before the bank was organized, and could not have been made by authority, or ratified. We say, the exception is itself insufficient, because argumentative, (Stephen's Pl., 179, 366, 384 and 420; 1 Chittey's Pl., 236,) and not a denial. Pleading must be positive: (Steph. Pl., 357, 358; Gould Pl., § 28, page 63.) But it is enough to say that the petition and amendments affirm that the contract was ratified, and the defendant promised to pay the same, and did pay a part; and that the bank received and enjoyed the fruits and benefits of what the plaintiff had done. See authorities cited below as to ratification.

The second exception is, that such a contract would be fraudulent against stockholders becoming such in ignorance of it. This is also defective for the reasons above stated—is argumentative, and does not directly and positively affirm that any one was ignorant of the contract. The commissioners, before incorporation, must be regarded as partners. (Dunlap's Paley's Agency, 4 Am. Ed., 155, conclusion of note a.) But ignorance cannot be pleaded, for the law does not permit such ignorance. "The affairs of the company are, in presumption of law, known to all the partners, and all are liable." (Bab. on Setoff, 43.) The learned counsel for the defense calls Babington "a little book," thereby insinuating that the above is not law. As the gentleman wants quantity rather than quality, we cite some larger books

upon the subject.    Babington refers to Peake's *Nisi Prius*.    According to our statute, citation to one partner is citation to all.
(O. & W. Digest, article 1542.)  Notice to one is notice to all.  (4
Bing., 562; 4 Term., 516; 19 Ves., 291; 7 Cow., 416; 8 Cow.,
253, 670; 8 Wend., 665; 1 Campbell, 82.)   The act of each
partner in transactions in relation to the partnership business is
considered the act of all, and binds all.   (3 Kent, 41; 20 Pick.,
90, 96; 16 Louisiana, 223.)   "In contemplation of law, part-
ners are virtually present at, and sanctioning the proceedings of
each other, and each is invested with a power enabling him to act
as principal, and as the authorized agent of the copartners."   (2
Kinne's Comp., 351, and authorties there cited.)   "Partners are
imagined virtually present at, and sanctioning the proceeding they
singly enter into in the course of trade."   (2 Bouv. L. Dic., 292,
§ 8, title "partner.")   A like objection was made in the case of
Edwards v. the Grand Junction Railway Company, but the court
said:  "It was contended for the railway company that to enforce
this would be injustice to the shareholders of the company, who
had no notice of such an arrangement, to which two obvious an-
swers can be given : first, that the court cannot recognize the
rights of individuals interested in the corporation, but must look
to the rights and liabilities of the corporation itself."   (1 English
Railway and Canal Cases, 148.)   But the petition affirms that
the "whole transaction on the part of the plaintiff, was open, fair,
legal and moral;"  "and the contract was known to the defend-
ant;"  "The bank having paid a part thereof," and this is conclu-
sive as to the demurrer.

The third exception, that the contract would be fraudulent and
void, as to subsequent stockholders in ignorance of it, is also de-
fective for the reasons above given.   Subsequent subscribers are
presumed to know upon what they are entering; they take stock
in the institution as it is, and act at their peril.   They reap the
benefit and advantage, and must share liability and loss.   (Red

field on Railways, pages 3 to 6 inclusive.) " A subsequent board of directors is to be considered as knowing all the circumstances communicated or known to a previous board." (Mechanic's Bank of Alexandria v. Seton, 1 Peter's 299; Fulton Bank v. New York & Sharon's Canal Co., 4 Paige Ch. R., 136.) A corporation has a continuing existence and personality in law, and courts cannot take notice of any change in its stockholders, or recognize the right of individuals interested in the corporation, but must look to the rights and liabilities of the corporation itself. (Edwards v. Grand Junction Railway Company, before quoted.) The corporation being the same from beginning to end, notwithstanding any changes in its members, it follows that when it once has knowledge of a fact, that knowledge attaches to the corporation and continues with it. Indeed, if this exception of the defendant is sound, a corporation could cancel all of its debts by taking in an additional stockholder " ignorant " of its liabilities—a capital mode of repudiation! But fraud is a question of fact. (Briscoe v. Bronough, 1 Texas, 326; DeLeon v. White, 9 Texas, 598; Drinkard v. Ingraham, 21 Texas, 650.) And it is the peculiar province of a jury to decide it. Certainly the plaintiff's petition does not allege fraud on his own part; but shows fair and honest dealing in himself, and trickery, deception and bad faith on the part of the defendant. The charges of fraud in defendant's pleadings cannot by any adroitness be transferred to the plaintiff's allegations. Fraud is not to be presumed. (Briscoe v. Bronough, before cited; Turner v. Lambert, 2 Texas 365; Thompkins v. Bennett, 3 Texas, 36; Graham v. Roder, 5 Texas, 141.) So it seems that cotemporary members and their successors must know the affairs of the concern, and therefore there could be no ignorance, deception or fraud as alleged by the defendant.

The fourth exception is that the contract sued on was contrary to the policy of the laws of the United States. We would observe, by the way, that " the objection that a contract is immoral

or illegal, as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant." (Smith v. Smith, 20 Texas.) The defendant alleges turpitude on the part of itself to avoid its liabilities. This exception is the basis of its main argument; and the fact that of all the numerous authorities cited to support this objection, not one is in point or applicable, is proof enough of the just ground upon which the plaintiff stands. The cases referred to in Story's Eq. Jur. are neither applicable in fact nor principle. The plaintiff did not act as a marriage broker; made no secret contract for the purpose of overreaching ignorant and credulous persons; used no influence over any one to induce an unlawful or impolitic act; there was no intentional (or unintentional) concealment or misrepresentation; no agreement not to bid at a public auction; no secret contract to deceive or influence legislation; no agreement founded on a violation of public trust or confidence; no contract for buying, or selling, or procuring a public office; no effort to establish a bawdy-house. No such facts existed as are embraced in the authorities cited by Story, and certainly no such case is shown by the petition and amendments; and the counsel for defendant went far beyond his exceptions and out of the record to imagine and charge wrong on the plaintiff; and the court was evidently misled. We heartily admit that " all agreements, bonds and securities, given as a price for future illicit intercourse, (*premium pudoris*) or for the commission of a public crime, or for the violation of a public law, or for the omission of a public duty, are deemed incapable of confirmation or enforcement, upon the maxim—*ex turpi contractu non oritur actio*." (1 Story's Equity, § 296.)

The two authorities most relied on by the defendant were the Tool case, 2 Wallace, 45, and the case of Marshall v. the Baltimore and Ohio Railroad Company, 16 Howard, 314. It is plain that the first is not applicable, because there the plaintiff was to be paid for obtaining a contract to manufacture arms for the gov-

ernment. The government might have been affected by the quality and price of the arms—almost the certain effect of such agency would be injury to the government. The relation between the parties was that of manufacturer and purchaser. In this case there was nothing of the kind; there was no agreement here to obtain a contract for another person. The plaintiff had already obtained a privilege for himself, which was agreeable to public policy and law. He had a perfect right to give up or surrender this privilege, and do no violence to the law or public policy. And then another party had a right to apply, in accordance with law and public policy, for the privilege of establishing a bank. There being two parties, wishing to accomplish the same object, each being in the other's way, and it being impracticable for both to succeed, it was entirely legitimate, right and moral for the plaintiff to surrender, resign or yield his benefit or privilege, for a consideration, in order that the promisors should make application and obtain the privilege themselves, to do that which the law contemplated and desired. The plaintiff did not undertake, or attempt to convey or transfer a title, or estate, or office, or right, or franchise, to others which was bestowed in trust and confidence on him; binding the government to a new party in his stead, whom it knew not and had not chosen. He attempted no imposition or fraud whatever upon the government; and there is not the least foundation or apology for making such a charge or assertion. The department at Washington had the clear right to refuse the application of the new party, or grant what they sought. There was no way or danger of defrauding, cheating or injuring the government, as the department had the matter entirely within its own control, and could protect itself; as proved by the deposition of the comptroller of the currency, on file in the cause. And all such pretense on the part of the defendant is mere clamor and humbug, for the purpose of defeating the plaintiff's right.

The case from Howard was the one relied on by the court be-

low as the basis of its decisions, as stated by the judge. But how does it apply in fact or principle? There the contract with Marshall was to act with "absolute secrecy," and influence the Legislature of Virginia so as to procure the right of way over the State for the road, etc. The case shows that the corrupting means of "log rolling," bribery, etc., was to be resorted to, and it would be as logical and as appropriate to read a chapter from the Koran as to cite that case in this suit. What excuse can there be for alleging that such attempts were made by the plaintiff? And how can any intelligent person, who glances over the petition and amendments, say that the plaintiff himself discloses that he resorted to such means and illicit practices?

Although we deny that the case at bar has, or had anything to do with legislation, either directly or indirectly, or contracts to influence legislation, or the departments of government, or any public officer, yet, as the defendant has seen proper to bring forward such questions in argument, we, out of abundant caution, and to defeat the opposition on its own ground, invite the particular attention of the court to the case of Edwards v. The Grand Junction Railway Company, before referred to. And there are some points decided in that case that are strictly applicable. The proprietors of the Grand Junction Railway Company applied to Parliament for a charter, which interfered with the trustees of the road from Liverpool to Warrington, as well as others, who intended to oppose the act of Parliament for said reasons; but an agreement was entered into (not more clear or explicit than the one sued on in the present case) which caused the opposition to the charter or act to be withdrawn, and the withdrawal of the opposition seriously affected the public interests. Yet the agreement was sustained. The Vice Chancellor said, "I think that where parties are going before the Parliament for the purpose of being incorporated, a door would be opened to great frauds, if bargains made by persons acting as their agents, when they are in a scat-

tered and individual state, were not binding on the company when incorporated. I think that there is nothing objectionable in point of law to such an agreement." (1 Eng. Railway and Canal cases, 187.) There the same objections were made as here. (See the points made by the defendant, Id. 187.) It was there contended that Moss only bound himself, personally; here it is claimed that Roberts bound himself personally; there it was said that Moss never could mean to contract on behalf of a company not then in existence, and, consequently, incapable of ratifying any agreement, here the same thing is contended as to Roberts and the bank; there it was contended that a corporation could only be bound by an instrument to which the common seal should have been affixed, here it is urged that the bank is not bound because the directors did not solemnly affirm or ratify the contract in their corporate capacity; there, as here, it was declared that the agreement was void on the grounds of public policy. In that case it was contended that a voluntary society, after a charter of incorporation, became a perfectly new body of persons, in regard to contracts made with the society before the act of incorporation, here it is contended that the commissioners and the bank had no connection with the plaintiff, but stood on a new and distinct ground, exclusive of the projectors, etc.; there it was said that the agreement with the projectors was a fraud on the Legislature, and also on the subscribers to the undertaking, here a similar argument is sought to be applied. Further, in that case, it was said that there was no agreement binding on the corporation, and here it is claimed that the bank was no party to, but repudiated the contract. The chancellor, in the case cited, said: "It cannot be necessary to observe, upon the alleged circumstances, that Mr. Case said that there was no agreement; he could not release or destroy the agreement, if it in fact existed." (Id., 148.) The plaintiff shows in his pleadings that there was a contract; that the defendant ratified that contract by adopting it, and organizing in accor-

dance with it; by part payment of the contract, and by the subsequent employment of the plaintiff to aid in perfecting the organization. All the objections urged in the case above cited were swept away by the chancellor as untenable.

On the same subject, we invite the attention of the court to the cases of Lord Howden v. Simpson, and Lord Petre v. The Eastern Counties Railway Company. (1 Eng. Railway and Canal cases, 347 and 462.)

In the first case a secret agreement, by which the opposition of a peer of Parliament was removed, and which was not communicated to other land holders to be affected by the act sought, was held to be valid; and, in the latter, a similar contract, as to its effect upon a peer of Parliament, was sustained. Other rulings in these cases are decidedly favorable to the plaintiff in this cause.

On the subject of consideration, the plaintiff refers to the following authorities, promising that it was not necessary that he should have had anything to transfer to the defendant, nor was it at all necessary to show that the defendant was in any respect benefitted by the contract sued on: "for it is a perfectly well settled rule, that if a benefit accrues to him who makes the promise, or if loss or disadvantage accrues to him to whom it is made, and accrues at the request or on the motion of the promisor, although without benefit to the promisor, in either case the consideration is sufficient to sustain assumpsit." (1 Par. on Con., 358, and the many authorities referred to; Bacon, administratrix v. Hugart, 2 Texas, 478; James v. Fulcrod, 5 Texas, 512.) "So in respect to the extent of trouble, loss, or obligation which the promisee has taken upon himself at the promisor's request, we shall observe upon considering the cases presently referred to, that it is immaterial that the detriment or charge thus assumed is, in fact, of the most trifling description, provided it be not utterly worthless in fact and in law; and that to constitute a good consideration, no benefit need result to the promisor from the performance of the stipulated act

xxxiv—20

by the promisee, according to the agreement." (Chit. on Con., 31, 32.) " And inequality of consideration upon entering into an agreement for the compromise or abandonment of a doubtful right, will not defeat the contract." (Id. 31.) So if the plaintiff's right was in truth doubtful, which was not the case, his abandonment of it at the instance of Roberts and the other commissioners of the bank, was a sufficient consideration to support the contract sued upon. " Waiver of a legal right, at the request of another person, is a good consideration for a promise by him." (Farmer v. Stewart, 2 N. Hamp., 97; Nicholson v. May, 1 Wright, 660; Stebbins v. Smith, 4 Pick, 97; Haiman v. Moulton, 14 Johns, 466; Smith v. Weed, 20 Wend., 184.) Even if the plaintiff's application at Washington was informal, (it is stated in the petition to be formal and legal,) yet the giving up of his right or advantage at the instance of the commissioners aforesaid, was sufficient to support the contract or promise made by them. " So the giving up of a guarantee not clearly good in form, or unstamped." (Haigh v. Brooks, 2 P. & Dav. 477; 3 P. & Dav. 452.) The two parties at Houston conflicted with each other, and admitting, for argument sake, that the plaintiff had a doubtful right, then we say, " The compromise of doubtful and conflicting rights and claims is not only a good and sufficient consideration to uphold an agreement, but it is highly favored in law." (Zane v. Zane, 6 Munf., 406; Taylor v. Patrick, 1 Bibb., 168; Fisher v. May, Id., 448; Trust v. Chaplain, 4 Hawks, 178; Hodges v. Saunders, 17 Pick., 474; Stephens v. Bateman, 1 Bro. C. C., 22, 26, and note a; Brown v. Sloan, 6 Watts, 421; Stoddard v. Mix, 14 Conn., 12; Rice v. Bixler, 1 Watts & Serg., 456; Barlow v. Ocean Ins. Co., 4 Metcalf, 270.) " And the court will not investigate the merits or demerits of the different claims for the purpose of setting aside such compromise." (Mill v. Lee, 6 Munr., 97; Moore v. Fitzwater, 2 Rand., 442; Bennett v. Paine, 5 Watts, 297.) In Mill v. Lee the court say: " Whether

the facts relied on in this bill, would have been sufficient to defeat the bill pending at the time of the compromise, is a question which this court need not go into. The comparative merits of the two conflicting claims which were compromised, will not now be tried. The claims conflicted; they were sued out from the land office according to the forms of law; they were conflicting patents, actually located on the same land. This was enough to lay a good and equitable foundation for the compromise. If neither party superinduced the compromise by fraud or imposition, neither party can attack the compromise by showing his claim was the superior in law or in equity." The chancellor quotes the following from the case of Conn v. Conn, 1 Pr. Williams, 726: "That where two parties are contending, and one releases his pretensions to the other, there can be no color to set this release aside, because the man that made it had the right; for by the same reason there can be no such thing as compromising a suit, nor room for accomodation; every release supposes the party making it to have a right; but this can be no reason for its being set aside, for then every release might be avoided." The chancellor also quotes Stapleton v. Stapleton, 1 Atk. 10, as follows: "That an agreement entered into upon a supposition of a right, or of a doubtful right, though it afterwards comes out that the right was on the other side, shall be binding, and the right shall not prevail against the agreement of the parties, for the right must always be on the one side or the other, and therefore the compromise of a doubtful right is a sufficient foundation of an agreement." (Id. p. 98.) And the court proceeds to say: "The compromise of a doubtful claim cannot be set aside but for fraudulent misrepresentation of facts, or fraudulent concealment of facts, or such imposition otherwise as amounts to unconscientious and unfair dealing." (Id.) "The compromise of a doubtful title, when procured without such deceit as would vitiate any other contract, concludes the parties, though ignorant of the extent of their rights." (Hoge v. Hoge, 1 Watts, 216, 217.)

"If two. claim land by different titles, and one purchase of the other his right, and there is no fraud, the settlement of the dispute is a sufficient consideration to support the contract, though the title purchased be bad." (Cavode v. McKelvey, Addis. 56. See also, Okeson v. Barclay, 2 Penn. 531.) The mere delivery of the forms, papers, etc., which plaintiff had received from the department, as stated in his pleadings, to the said commissioners, at their request, if he did nothing else, was sufficient. "So the giving up a letter by the plaintiff to the defendant, at his request, by means of which the defendant was enabled to settle certain controversies, and obtain a large portion of O.'s effects, to which defendant claimed to be entitled, was held to be a sufficient consideration to support a promise by defendant to pay plaintiff £1000." (Wilkenson v. Oliveira, 1 Bing. N. C., 490.) The projectors did not think the sum named in the obligation sued on exorbitant, as they very readily entered into the contract to pay the amount.

It is contended by the defendant that the promise to pay the plaintiff $3000 in stock was illegal, because the stock would be owned by individuals. Evidently it was expected that the bank would have stock to dispose of; but supposing that the bank could have no stock of its own to transfer to the plaintiff, as required by the contract sued on, yet that part of the consideration was good, because the contract assumed that the bank would have the stock, and in case all the shares should be owned by individuals the bank was required to obtain so much thereof from them, as would satisfy the contract, or else pay the stipulated sum in money. "A promise is not void against the party who makes it, merely because its execution is improbable or difficult, or the impossibility of performing it applies only to the promisor, individually, the law not forbidding the thing to be done, and there being no breach of moral duty involved in it. If a party, by his own contract, lay a charge upon himself, he is bound to perform the stipulated act, or pay damages for the non-completion, unless the matter were at the

time manifestly and essentially impacticable. * * * It is upon this principle that an engagement upon a sufficient consideration for the performance of an act even by a third person is binding, although the performance of such act depends entirely on the will of the latter." (Ch. on Con., 59, and the cases cited, of Floyd v. Crisp, 5 Taunt., 249; McNeil v. Reid, 2 Moore & S., 89; 9 Bing., 68 S. C.) But this objection, even if tenable, does not apply to the $5000 in currency, stipulated to be paid to the plaintiff.

On the subject of ratification, the following authorities are relied upon by the plaintiff: "If a perfect stranger assumes to act for a party, the latter may adopt his agency, and has an election either to ratify or reject the acts thus done by him. A subsequent ratification is equivalent to a previous authority." (1 Am. Leading Cases, 590, and authorities referred to, and Id. 592.) If a contract be made, or an act done for one without authority, and the consideration of the contract or act, or a benefit under it, be accepted and retained, etc., it is a confirmation of the contract or act; and, in general, a ratification of a part of a transaction, by claiming a benefit under it, is a ratification of the whole, because it affirms the agency, and these principles of ratification by acts are as applicable to corporations as to private persons. (Ibid., 593 and 594, and the many authorities there cited. See also Parsons on Contracts, 45 and 46.) Ratification of a part is a ratification of the whole. (Id., 47. See further, as to ratification and liability of the defendant, the case of Low v. Connecticut and Passumpsic Rivers Railway, 45 N. H., 375; see case in full as cited in Redfield's American Railway cases, 1, et seq.)

*Gray & Botts*, for the defendant in error.—An examination of the laws of the United States, " to provide a national currency, secured by a pledge of United States bonds, and to provide for the circulation and redemption thereof," is necessary to elucidate the

points presented. (United States Statutes at Large, vol. 13, 99 to 118; and Brightley's Digest United States Laws, vol. 2, 51, title Banking.)

It is under the provisions of this act that plaintiff claims that he had incurred expenses and rendered services, and acquired his right to establish a bank. Is there any provision in that law by which he could have acquired such privileges, or under which Roberts could have authority to act as a commissioner for organization, or to bind the corporation to be established? After providing for organizing a currency bureau in the treasury department, and appointment of a comptroller of the currency, etc., then follow provisions for the "organization of banking companies." The fifth section provides: "Associations for carrying on the business of banking may be formed by any number of persons, not less in any case than five, who shall enter into articles of association, which shall specify, in general terms, the object for which the association is formed," etc., "which said articles shall be signed by the persons uniting to form the association, and a copy of them forwarded to the comptroller of the currency, to be filed and preserved in his office." The next section provides for a certificate of organization, to be signed by the parties associating, and specifying, first, the name of the company, subject to the approval of the comptroller; second, the place of business, specifying State, county and city, etc.; third, the amount of capital stock, and number of shares; fourth, the names and places of residence of shareholders, and number of shares held by each; and, fifth, a declaration that the certificate is made to enable the parties to avail themselves of the act allowing the establishment of banking corporations. This certificate is then required to be acknowledged before, and certified by a judge, or notary public, authenticated by seal of office, and must be transmitted to the comptroller of the currency, to be preserved and recorded in his office.

These documents, consisting of articles of association, certificate of organization, signed and authenticated by an officer, including a declaration of the purpose of the parties, constitute the application for a bank charter under the act. None other is provided for, or contemplated by it. When thus formally prepared, these documents are to be transmitted to the comptroller, but even then he is not authorized to grant permission to them as a corporation. No franchise, or right, is thereupon to be given by him until other provisions of the act shall be complied with, as will be seen by further examination. Perhaps these steps may be a kind of caveat or notice to him of the application, but no vested right thereby results, and no permission or approval of his could confer such a right, because not conferred upon him by the act. Certainly nothing less than their compliance with the requisites of the law could authorize him to grant a permission, privilege, right or preference to any one. A mere letter of application from a party expressing a desire to establish a bank, was no compliance whatever with the legal requisites to secure the benefits of the act. Those privileges were open to all citizens who desired to secure them, and who applied in the regular mode. They could not be anticipated by any other, as by a mere letter from a single person, any more than by verbal request for such a favor from the officer. Nor did the comptroller assume to grant any such privileges; for the allegation is only that he granted permission by furnishing the applicant with blank forms, instructions, etc. This was only a polite mode of informing the party that he had not acted under the law, if, indeed, he supposed that he had. Not even a written answer to the letter is alleged, while the only mode prescribed for the comptroller's official approval is his formal certificate under seal of office. (See § 12, last clause, and §§ 17 and 18, Brightley's Digest, vol. 2, 54, 55.)

We submit then, that it clearly appears from these provisions that plaintiff did not acquire any preference, privilege, or right,

whatever, by his lettter of application in 1865, and had none in January, 1866, when the alleged contract was made with Roberts. It also appears that there was no association of persons competent in law to appoint a commissioner or agent. This point is further shown by the provisions of the 8th section of the act, which declares in explicit terms the earliest period when an association shall be held to have been formed, and negatives action of any character prior to that time. The period thus fixed could not be fixed earlier than the formal execution of the articles of association provided for by section 5th, and authentication of the certificate required by section 6th. The 8th section declares that "every association formed pursuant to the provisions of this act, shall, from the date of its organization certificate, be a body corporate, but shall transact no business except such as may be incidental to its organization, and necessarily preliminary, until authorized by the comptroller of the currency, to commence the business of banking."

Thus it appears that no such association could have a legal existence until organized, for even after such organization, its legality was only recognized for preliminary purposes, and its action restricted to them. The law nowhere contemplates agents or commissioners for organizing, but leaves all anterior proceedings for soliciting subscriptions of stock, and the like, to the voluntary action of such individuals as were interested in the enterprise. The plaintiff might solicit subscriptions; so might Roberts, or others; and they, individually, might make such contracts between themselves binding, individually, as the law might allow, for valuable consideration; but no such contract (even if legal in itself) could be binding on a non-existent institution, nor on those who might be ignorant of the existence of such a contract, when they became members of the legal association, or corporation. This proposition seems too clear to require either further comment, or authority. It follows that the alleged contract with Roberts was

void, for want of authority in him to make it for the proposed association.

Second—Further examination of the provisions of the act will, we think, show that such a contract was not only without a consideration and without authority, but also that it was contrary to the policy and intention of the law, because it would operate as a fraud upon stockholders, taking and paying for stock in ignorance of it, and also involved a breach of the provisions of the law, and was calculated to deceive and to induce improper influence on the comptroller of the currency, in his action and decision upon the propriety of granting a charter, with which responsibility and trust the law invested him.

Again, if the plaintiff could have legally acquired any such right as he alleges, and the comptroller had granted it to him, on what grounds must it have been done? The comptroller, as a public officer, exercising a trust power of this character, must be presumed to have exercised it for the public benefit in selecting the plaintiff. The banking and currency act was a great public measure, to be carried into effect in time of war and financial distress, when the government needed reliable, loyal and business men, of financial ability, and of character to give confidence. If such a power was vested in the comptroller, he must be presumed, as an honest and efficient officer, to have exercised it, in view of his belief that the plaintiff possessed these characteristics so essential to the proper management and success of the banking system. And it must also have been that the plaintiff was expected to invest his means, and also to give his personal services to the management of this bank; and not that he might sell the privilege, transfer it to others for money consideration, dependent upon their, and his, securing a charter from the comptroller. If such a trust and privilege was granted him by the comptroller, and he had authority to give him such a preference, we are authorized to say that the sale and transfer of it was not contem-

plated, and would be a violation of the trust reposed, contrary to public policy, and therefore any contract for such a purpose would be void.

Suppose the comptroller had given such preference to plaintiff, and was proceeding to grant this charter on the belief that plaintiff's application was the basis on which the organization had been formed, (as plaintiff alleges was the fact,) and he had been shown this contract before granting the requisite certificate—in such case, we ask, what would have been the effect upon that officer? Would he have regarded it as a legal contract, or would he not have regarded it as a violation of the trust reposed in the plaintiff? This question, we think, presents a test of the legality of such a contract. On this point we are authorized to say, and quote it for the benefit of this court, that plaintiff "did not secure any right to organize a national bank, which could be considered a matter of bargain and sale. On the contrary, the sale, for a pecuniary consideration, of the permission granted to organize a national bank, would, if known, be regarded as proper ground for revoking such permission."

That such an answer would, and should be given, appears to be based on reason as to the policy of the banking laws, and the impolicy of such contracts being allowed. The policy of the banking act from first to last, in every provision, is, that there shall be perfectly open and fair dealing, subject to inspection of the government officers in every particular, so that the organization of every bank should be open to the application of any and every citizen having capital; that there shall be no undue favoritism; that the capital of the bank shall be *bona fide* paid in and secured by United States bonds, and otherwise, so that it shall afford solid foundation for credit and honest management; and inspection of the affairs of the company by the Government officers, at all times, and periodical publications of its condition, under oath of its officers, so as to secure this honesty and good credit, are required by

the law.   But, if such secret, outside contracts as this alleged by plaintiff, can be sustained and enforced in a court of equity or law, then all the requisites for honest representation of facts, preliminary to organization, and openness to inspection by the Government officers, are lost and abrogated.   It becomes, then, the interest of persons who may seek to make something for nothing, to seek the favor of the comptroller, by personal favor or political interest, and when obtained, then to abuse the trust and confidence reposed in them, by secretly selling out for a bonus to others who may not be worthy; thus deceiving both stockholders who may subscribe and pay their money in ignorance of the secret management and trickery practiced, and the comptroller, who has no right to suspect that bogus stock is to be issued, or that the capital stock paid in is to be immediately paid out again.

Or again, if such contracts can be enforced, they directly encourage corruption in the management of banks, by the interest it gives to such speculating parties to use undue influence with the comptroller, first by getting such permission for banks and then urging them to be chartered by him to others, who will pay this contracting agent for his personal or political influence with the comptroller or other government officers.   Why, in this very case an amended petition of the plaintiff alleges that he ought to be paid for his services in procuring the charter, because, forsooth, this association had paid "a Mr. Paschall," and "a Mr. Sherwood," for their services, and that his services were worth as much as their's was.   We have no doubt of that, and also that none of them were legitimately entitled to compensation.

We beg to say that none of the present officers, directors or stockholders of this corporation were then officers or members, and that none of them had any agency in, or connections with, this alleged contract.   But if they had had, still they are not legally liable for it, nor debarred from alleging the illegality and impolicy of the contract in bar of this suit.

If the contract was, as we think the foregoing considerations show it to have been, against the policy of the banking act and violative of its principles and objects, then it cannot be enforced in law or equity. The law exclaims in such case, "*Procul; hinc! procul este profani, totoque absistite loco.*" The defense is allowed and sustained, not for the sake of the defendants, but for the sake of purity of the courts, and that the ear of justice may not be polluted by the recital and consideration of nefarious contracts and parties.

This doctrine is so familiar that it scarcely needs authority, but we cite : 1 Story's Equity Jur., §§ 258, 265 and 294 to 296 *a ;* Armstrong v. Toler, 11 Wheat., 258 ; Bartle v. Coleman, 4 Peters, 187 ; Holman v. Newlan, Cowper's R. These cases are cited in Smith v. Smith, referred to in 30 Texas R., 754 in note, but not published. It was decided at Austin term, 1866. We also cite Marshall v. Baltimore & Ohio R. R. Co., 16 Howard, 314 ; Harris v. Roof's Executor, 10 Barbour, 493, 494 ; Fuller v. Dame, 18 Pickering, 472 ; 2 Wallace, 45.

WALKER, J.—The paper writing signed by J. S. Roberts, "Commissioner First National Bank, Houston," and dated January 20, 1866, is not the contract of the First National Bank of Houston, unless the bank made it so by its approval and adoption, after its organization under the laws of the United States.

It may be that J. S. Roberts is individually liable to the plaintiff for the money he claims from the bank ; but, not being called on so to do, we shall offer no opinion upon that question.

The plaintiff avers a consideration moving to the bank, and that the bank, after its organization, appropriated the benefits of his labor, money and influence. That it adopted and confirmed Roberts's action, making that action its own.

If this be true the bank is liable, and the question presented should have been submitted to a jury.

The court erred in sustaining the demurrer to the petition; upon the question of fact presented in the pleadings the liability of the bank depends.

The judgment of the district court is reversed, and the cause remanded.

Reversed and remanded.