NUMBER 13-03-267-CV

 

                         COURT OF APPEALS

 

               THIRTEENTH DISTRICT OF TEXAS

 

                  CORPUS CHRISTI - EDINBURG

 

 

 

CITGO REFINING AND
MARKETING, INC., 

AND CITGO PETROLEUM CORPORATION,                   Appellants,

 

                                           v.

 

AMELIA
GARZA, ET AL.,                                           Appellees.

 

 

 

             On
appeal from the 28th District Court

                     of Nueces
County, Texas.

 

 

 

                              O P I N I O N

 

        Before Justices
Hinojosa, Yañez, and Castillo

                    Opinion by Justice Castillo

 








Appellant, Citgo
Refining and Marketing, Inc. and Citgo Petroleum Corp. ("Citgo"),
appeals from a final judgment finding breach of a settlement agreement.  The underlying suit involves a class action
against numerous defendants claiming damage to various parcels of real property
and resulting diminution in value from airborne toxic contaminants.  Appellees are representatives of the class
and subclasses as originally certified by the trial court in an order dated
November 14, 1995.  Citgo (independent of
other defendants) and appellees entered into a stand-alone settlement agreement
in late September 1998.  Appellees
amended their pleadings to sue for breach of the settlement in March 2000.  The parties tried the matter before the court
in August 2001; an order finding breach issued October 17, 2001.  A separate hearing on attorneys' fees was
held in February 2002.  In September
2002, the trial court held a hearing to determine fairness of the settlement
agreement.  Final judgment, finding the
settlement to be fair, adequate and reasonable, and awarding damages in favor
of appellees, issued April 4, 2003 . This appeal ensued.  We reverse and remand.

Background








The underlying suit
sought certification of a class of real property owners alleging nuisance,
trespass, and negligence of various defendants, including Citgo, for damages
and resulting diminution in property value based upon airborne contamination.  The trial court held a hearing on the
certification issues in October 1995. 
The trial court issued an order certifying the class on November 14,
1995, composed of various subclasses based upon location of a class member's
property and its date of acquisition.  Three classes were certified: (1) the I-37
North Residential Property Damage Class ("I-37 North Class")
(composed of several subclasses based upon date of acquisition of the
property); (2) the I-37 North Free Phase Hydrocarbon Property Damage Subclass
(a subclass of the North Class, a/k/a the "Oak Park Triangle"); and
(3) the I-37 South Residential Property Damage Class ("I-37 South
Class") (composed of several subclasses based upon (a) geography in
relation to Leopard Street and (b) date of acquisition of the property).  The order certifying the class, in addition
to identifying the various classes and subclasses, states:  "The Court finds the Plaintiffs= have satisfied their
burden of presenting some evidence that reasonable class definitions and other
conditions of Rule 42 are satisfied with respect to the Plaintiffs proposed
property damage classes."[1]  Certification of the class was appealed and
affirmed in August 1996.  See Amerada
Hess Corp. v. Garza, 973 S.W.2d 667, 671, 682 (Tex. App.BCorpus Christi 1996)
("Garza I").  The matter was
further appealed to the Supreme Court, but dismissed for want of
jurisdiction.  See Coastal Corp. v.
Garza, 979 S.W.2d 318 (Tex. 1998).[2]









In September 1997,
Citgo and appellees reached a settlement agreement, by which Citgo would pay
$12,292,758.19 to buy back properties located in the Oak Park Triangle, pay
$3.55 million to the balance of the I-37 North class, and pay $1.45 million for
the I-37 South class.  Attached to and
incorporated as part of the settlement agreement are various exhibits including,
among other things, a breakdown of the valuation amount to be paid for each
property in Oak Park (exhibit 3) and an Oak Park Protocol Agreement.  The protocol agreement sets out that the
offer for each parcel of property is based upon the adjusted assessed value of
the parcel as of 1996, to which a factor is applied and other allowances are
added.  Exhibit 3 sets out the exact
offer price for each parcel of property. 
The settlement called for all class representatives to sign the document
no later than October 6, 1997.[3]  The agreement sets forth various conditions
which must be satisfied before it is effective, including approval by the trial
court.  The parties agreed to seek
preliminary approval at the hearing scheduled for October 10, 1997; there are
provisions to provide for a continuance in the event approval was denied.  If no court approval was secured, Citgo had
no obligation to pay under the agreement. 
The agreement recites that by signing, the claimants provided a full
release and discharge, along with a covenant not to sue or institute other
legal, equitable or administrative proceedings against the settling defendants.[4]  The settlement is a stand-alone agreement
between Citgo and the appellees, independent of any other settlements that
might be reached with other defendants in the suit.








Appellees presented
the settlement to the trial court for approval in October 1997.  Plaintiffs' Motion for Preliminary Approval
of Settlements and Approval of Notice actually requested approval not only of
the Citgo settlement, but also of settlements with three other defendants, for
a total of three separate settlement agreements.  The motion reflects that the settlement with
Citgo involves only release of property damage claims and any medical
monitoring claims.  The motion further
states that "[a]s part of the settlement of CITGO, Class counsel and CITGO
seek approval of a small additional class of all persons who own property in
the Oak Park Areas, as of June 1, 1991 who have since sold such property. . . .
This requires the creation of a small sub-class . . . ."  In conjunction with the other settlements,
appellees noted they were also filing contemporaneously a request for
certification of a Commercial Settlement Class. 









At the hearing held
October 10, 1997,[5]
the trial court appointed a guardian ad litem to review the settlement and
assist in determining its fairness to class members, expressing its concerns
that dollars allotted for the Oak Park Triangle might be inadequate.[6]  On October 31, 1997, the ad litem reported to
the court that the settlement reflected monies paid to Oak Park property owners
were calculated upon the 1996 assessed value. 
The ad litem discusses a "settlement proposal" which impliedly
incorporates the other settlements, including those either under consideration
or already executed with other defendants, since in addition to the Oak Park
Triangle funds (which dollars exactly match the monies contemplated in Citgo's
settlement), additional substantial sums totaling $17 million are discussed as
part of the settlement.[7]  

On November 6, 1997,
Citgo filed its Memorandum in Support of Motion to Approve Preliminary
Settlement Class.  Citgo explained the
basis for its position that the monies tendered for the Oak Park Triangle, as
well as for remaining class members, were fair and adequate.  Much of this memorandum directly addresses
concerns of the court and others as expressed at the October 10 hearing.  Attached to the memorandum are detailed
materials reflecting how the property valuations were derived and
calculated.  

Appellees' counsel
forwarded a letter to the trial court on November 7, 1997, stating that the
"parties have continued their efforts to settle the class
action."  The correspondence notes
that the guardian ad litem was assigned to review only the proposal for the Oak
Park Triangle, that the plaintiff class included many additional property
owners, and that any settlement must treat all class members equally. 













In a supplemental
letter to the court dated November 17, 1997, the ad litem stated his conclusion
that "the initial settlement proposal should be modified to reflect a
redistribution of the offered funds." 
Although he notes that the proposed modification would not require an
increase in any settlement monies offered by the settling defendants, the ad
litem treats the various agreements as though each is contingent upon and
interconnected with the others.  He
contemplates an increase in monies allotted to the Oak Park Triangle,
principally from a potential settlement between the class and Amerada
Hess.  Importantly, he criticizes the Oak
Park Triangle portion of the settlement proposal (to which Citgo alone was
contributing) because it utilized 1996 property appraisal values as a basis for
calculation of offer price.  He
recommended specific "revisions" to the proposal.[8]  He proposed that the settlement utilize an
entirely different calculation to find a property value for the Oak Park
Triangle, that persons owning single family residences as of September 29,
1997, receive an additional sum for each year they lived in their home, and a
redistribution of monies allotted for attorneys' fees.  He states that "no other settlement
monies would be affected except for funds contributed in the future by [an
as-yet unsettling defendant.]"  He
then states:  "The suggested
modifications to the initial settlement proposal are being presented to this
Court after much consideration . . .  The
proposed revisions have been discussed with class representatives and have
communicated to me as being acceptable on behalf of the class."  There is no statement that the proposed
modifications were acceptable to Citgo, or any acknowledgment that Citgo's
settlement is independent of and not part of a larger package.








Appellees' counsel
subsequently communicated with the trial court on November 25, stating they
were "evaluating the increased cost" of the ad litem's
recommendations.  Appellees' counsel
stated: "We are committed to accomplishing a 'global' resolution of the
class action, and we cannot encourage the taking of money from some class
members for the purpose of accomplishing the buy-out of Oakpark (to the
detriment of the rest of the class members.) . . . .  We are also continuing our efforts for a
'global' resolution of the lawsuit." 
On December 3, 1997, appellees' counsel sent another letter to the trial
court, summarizing settlements reached to date; five defendants had entered
into settlements totaling $28.56 million for the Residential Class.[9]  This communication to the court reflects the
allocations as proposed in early October 1997, as well as modifications
proposed by the guardian ad litem.  Each
of the two proposed modifications deal directly with funds for the Oak Park Triangle.  Appellees' counsel addressed the proposals in
light of the increased costs they generated, including perceived problems or
issues if the suggestions were adopted exactly as proposed.  They concluded:  "While the current allocation of
settlements is fair and reasonable to the entire class and should be
preliminarily approved by this court, counsel would like the opportunity to
discuss possible alternatives with the ad litem."

On December 11, 1997,
a "revised offer" was tendered to the trial court.  The transmitting letter reflects that
attorneys for settling defendants, including Citgo, and class counsel had met
"in an attempt to find a solution to the concerns expressed at the
preliminary approval hearing."  They
had agreed to and recommended several adjustments to the plan to purchase
properties in the Oak Park Triangle, increasing monies paid.[10]  The letter noted: "The original buyout
proposal was to be funded entirely by Citgo. 
In order to put additional funds into the Oak Park buyout, funds from
other settling defendants must be and will be utilized.  Therefore all of the proposed settlements
must be accepted by the entire class (subject to opt in/out limits), or else
there is no funding for the Oak Park buyout (a consequence of [the ad litem's]
recommendations)."  A proposed order
which would approve settlement in accord with this letter was attached.  

On December 12, 1997,
the trial court issued a letter to counsel for appellees and to the guardian ad
litem, rejecting the revised proposal since it would only allocate
approximately $35,500 for each home in the Oak Park Triangle.  "This Court therefore orders that each
owner occupant of the Oak Park Triangle receive a minimum recovery of
$50,000.00. . . . In addition, this Court is rejecting [the guardian ad
litem's] proposal of $1,000.00 per year per resident."  None of the settlements were approved.  








On January 8, 1998,
appellees filed a Supplemental Motion for Preliminary Approval of Settlements,
Conditional Certification of Settlement Classes, and Approval of Notice of
Settlements.[11]  Appellees referenced not only the earlier
three settlement agreements, including the one with Citgo, but also two
additional agreements.  Included in the
supplemental motion for preliminary approval is a request for "approval of
three settlement classes:"

The first is the Oak
Park Settlement Class.  It includes all
persons who owned property zoned for single family residential use within the
Oak Park area on June 1, 1991 or September 27, 1997.  The second class is the Residential
Settlement Class.  It includes all
persons who owned real property zoned for single family residential use within
the Residential Area as of June 1,1991. 
Class counsel seeks approval of these two classes as to claims against
the Settling Defendants only and for settlement purposes only.

 

In addition, as part
of the settlements with Southwestern, Champlin, UPC, Hess, and OxyChem, these
companies and Class Counsel request that the Court conditionally certify a
Commercial Settlement Class of all persons who owned property as of June 1,
1991, other than property zoned single-family residential, within the
Commercial Class Area.

 

The motion states that
"Settling Defendants and the Class Members agree that each of these
classes meets the criteria for certification under Rule 42."  








There
are distinctions between this proposal and that set forth in the Citgo
settlement agreement beyond the redefinition of the classes.  Citgo's Oak Park Protocol agreement provided
for an "offer price" composed of an "adjusted assessed value of
any improvements located on that land plus a premium payment equal to 85% of
the adjusted assessed value of such land and improvements," based on the
1996 appraised values.  Additionally, the
Citgo agreement defined "owner occupant" as a person with title to
property zoned single family residential in the program area "as of
September 29, 1997."  This new
proposal called for payment to be made to those owning property as of June 1,
1991, in an amount equal to "185% of the highest appraised values, between
1989 and 1996," and "no person . . . will receive an offer less than
$45,500."  Class members deciding to
participate in the settlement "must sell their property to CITGO . . .
."  Appellees attached to their
motion a proposed "Order Conditionally Certifying Settlement Classes,
Preliminarily Approving Settlements and Form of Notice and Directing Notice to
be Sent to the Settlement Class."








Attached
to the supplemental motion for preliminary approval was a copy of a settlement
agreement with Amerada Hess (although this agreement lacks any signatures by
Amerada Hess).  Also attached was a
settlement agreement (executed) by yet another settling defendant.  Each of these settlement documents sought
"approval of three settlement classes"B those for which certification was requested in
appellees' motion.  The agreements are
drafted accordingly.  No addendum
referencing a similar request with regard to the Citgo settlement is provided.[12]  The settlement with Amerada Hess provided
specifically that residents of the Oak Park Triangle "will receive 185% of
the highest appraised values, between 1989 and 1996," and that no person
owning such a property "will receive an offer less than $45,500. . .
.  Class members who decide to
participate in the settlement must sell their property to Citgo for the stated
price within one year."  This settlement
directs certain sums for distribution to the newly-defined Residential and Oak
Park classes, but includes no indication as to how the monies will be allocated
between those classes.  Additional monies
are designated for the newly-defined Commercial Class.  The other settlement provides for monies to
be contributed to the Residential and Commercial classes only.  Each of these agreements calls for a
distribution protocol to be developed after preliminary approval is given by
the trial court.  

At
the time this proposal was submitted, Citgo's interlocutory appeal from the
original class certification order was still pending before the Texas Supreme
Court.  Appellees' counsel forwarded a
letter brief to the court asserting the court did nevertheless have
jurisdiction to approve a settlement pending such an appeal, but did not
address the proposal to certify differently-defined classes.[13]  








On
January 12, 1998, Citgo filed a Memorandum of Law in Opposition to Plaintiffs'
Original and Supplemental Motions for Preliminary Approval of Settlement.  In this document Citgo contended that (1) the
court had no jurisdiction to alter definition of the plaintiff classes pending
the interlocutory appeal, and (2) Citgo had not consented to any revisions to
its settlement agreement with members of the class, and its agreement did not
comport to the proposal as submitted to the court.  Citgo urged that its buy-out program was a
"stand-alone deal," and, in particular, that the opt-out provisions
in the new proposal differed substantially from those in Citgo's proposal,
removing many of the protections Citgo had built in to its agreement.  Citgo urged that in its agreement it was free
to proceed with the Oak Park Triangle buy-out even if more than ten percent
opted out of the settlement, but its decision to proceed under the new proposal
could be controlled by other defendants. 
Secondly, Citgo urged that the separate opt-out provisions provided in
Citgo's agreement were removed and now inextricably intertwined to acceptance
of the settlement by the other classes. 
Citgo urged that while a trial court may suggest modifications to a
settlement proposal, it may not adopt a settlement that has been modified
absent the consent of all parties, and it certainly may not unilaterally impose
modifications to an "agreed settlement" against the will of any
party.  A formal notice of objection was
also filed by Citgo on January 12, 1998. 
Appellees urge that this memorandum in opposition to the supplemental
motion for approval of the settlement agreements constituted the first instance
of Citgo's breach, by which Citgo failed to adhere to its agreement to
"work diligently and cooperatively to obtain the effectuation of the settlement
embodied in this Settlement Agreement."[14]  








A
hearing was held on the motion for preliminary approval on January 13, 1998.
Counsel for appellees represented that the settlement with Amerada Hess had
been finalized, but Amerada Hess's counsel clarified that it had not yet
executed the agreement; it remained an agreement in principle.  Citgo urged that its opposition was based
first on the issue of jurisdiction, but secondly on the fact that the
settlement agreement as presentedBas a package dealBdid not comport and in
fact conflicted with the stand-alone agreement earlier executed by Citgo.  Appellees countered, as they do here, that no
changes to the Citgo agreement were envisioned; rather any issues arise from
the integration of Citgo's settlement with the others to enhance the purchase
prices for the Oak Park Triangle properties. 
Appellees' counsel conceded that the proposed settlement classes did
differ from those earlier certified by the trial court:

What other differences
are there to show that they're not substantially the same? Well, they're
different in terms of time.  They cover
different time periods, therefore, different people.  They're different in terms of geography.  They don't cover the same area physically
that [the earlier certified classes] covered and they're different in scope
because they cover a commercial class which [was not] certif[ied]."

 








Counsel
for appellees urged that "[t]he settlement classes are completely apart
from the validity of the certification order," and that by agreeing to
settle each defendant did not have to agree with the merits order earlier
entered.[15]  Citgo continued to urge that opt-out
provisions for class members in the various agreements also differed  and necessarily impacted Citgo's rights to
proceed or not to proceed with the settlement. 
Discussion also arose about Citgo's proposal to go forward independently
with its purchase of the Oak Park Triangle properties, exactly as it had
proposed under its settlement agreement.  
Several other defendants urged that they simply wanted to resolve and
finalize their settlements.

On
January 22, 1998, class counsel forwarded a letter to class members stating
that Citgo

. . . has withdrawn
their offer of settlement regarding this lawsuit, effectively removing
themselves from the trial court=s  judicial supervision.  Citgo has proposed to buy properties within
the Oak Park Triangle at the price ordered by the trial court, and with the
same conditions negotiated by our law firm. . . . In order to protect the
interests of all the class members, we will be filing a motion today to
decertify the class action that was originally certified . . . in November of
1995.  It is our belief that the original
class certification no longer accurately reflects the current status of this
litigation.

  

The motion was filed
that same day, January 22, and urged that decertification would moot the
pending interlocutory appeal, thereby removing any remaining obstacles to Citgo
proceeding with its settlement agreement.[16]  The trial court's order of January 27, 1998
stayed consideration of the motion to dissolve pending resolution of the
pending appeal.  








On
January 23, 1998, the trial court issued an order (1) severing all claims
against settling defendants other than Citgo, (2) conditionally certifying two
of the proposed settlement classes for the Residential[17]
and Commercial classes, (3) preliminarily approving the settlement agreements
with the severed settling defendants as fair and reasonable, and (4) approving
notice for the Commercial and Residential settlement classes.

Citgo
forwarded a letter to all counsel on February 3, 1998, announcing it had
undertaken an independent property purchase program in the Oak Park Triangle,
following the guidelines set out by the trial court and the guardian ad litem.[18]  Class counsel responded on February 12, 1998,
stating it would not "stand between our Oak Park clients and a buy-out of
their properties.  Indeed Class Counsel
are responsible for creating the buy-out in the first place . . . .  However, we also represent non-Oak Park Class
members who stand to lose . . . as a result of Citgo's decision to breach its
Settlement Agreement.  This is to inform
you and your client that we intend to hold you responsible for breach of the
settlement agreement. . . ." 
Appellees contend this buy-out, which then proceeded between April 1998
and March 1999, was the second instance of a breach of the settlement agreement
by Citgo. 








The
supreme court dismissed the interlocutory appeal from the class certification
order on July 14, 1998, finding that it did not have conflicts
jurisdiction.  On July 16, 1998,
appellees withdrew their motion to decertify the class.  Throughout the remainder of 1998 and 1999,
appellees proceeded with discovery and other pre-trial matters, actively
litigating the property devaluation claims against Citgo.  The original class structure as defined in
the class certification order of November 1995 remained in effect for Citgo, as
a non-settling defendant, with respect to those class members who had not
already resolved and released their claims against Citgo as a result of the Oak
Park Triangle buy-out (which included some residents of the Hillcrest area as well).









The
docket control order then in place identified May 1, 1999 as the deadline to
amend pleadings, with a trial date of June 1, 1999.  Trial was subsequently reset for January 24,
2000.  Then, on January 12, 2000,
appellees' counsel filed a notice of oral hearing on their motions and
supplemental motions for preliminary approval of the settlement and approval of
notice relating to the Citgo settlement agreement, filed in October 1997.  That same date Citgo filed renewed and
supplemental objections, urging that the settlement agreement had been
abandoned or waived by the plaintiff class since then, it having taken numerous
inconsistent actions.  Citgo also urged
the doctrine of quasi-estoppel prevented revival of the settlement agreement, as
well as laches.  Citgo further urged that
appellees were requesting that the court approve a settlement to which Citgo
never agreed.  Citgo attached the
affidavit of its in-house counsel, Miles Davidson, relating the sequence of
events, the lack of opposition to and acquiescence with the Oak Park Triangle
buy-out, the aggressive pursuit by appellees of their claims on the merits,
including extensive and expensive discovery, their expressed determination to
try the case against Citgo, as well as their expressed belief that the
settlement agreement was no longer viable. 
Davidson also referenced a meeting in November 1998, at which appellees'
counsel delivered a settlement demand for $14,000,000 to resolve the remaining
claims.  He stated there had never been
any suggestion that the settlement agreement had any continuing effect in the
intervening two years, that the trial setting in early summer of 1999 had
passed without any reference to the supposed settlement, appellees had
unequivocally abandoned the settlement agreement as void, and that active
discovery had continued through December 1999.  
Davidson asserted that Citgo reasonably relied on those acts and
statements to its detriment, proceeded with its buy-out of the Oak Park
Triangle at the enhanced levels recommended by the guardian ad litem
(ultimately costing in excess of $14.8 million, which was in excess of that
provided for in the settlement agreement), 
and  the additional expenditures
on attorney fees and litigation expenses in excess of $500,000 in the
intervening two years. 

The
trial court conducted a hearing on appellees' motions on January 14 and 25,
2000.  The trial court noted that its
letter of December 12, 1997, in which it ordered that a minimum of $50,000 was
provided to each property owner in the Oak Park Triangle, was only directed to
appellees' counsel and the guardian ad litem. 
The trial court's opinion was that 








. . . this letter did
not change the settlement agreement that was entered into by the parties, and
it did not modify the money that Citgo was going to give to the
Plaintiffs.  The only thing that this
letter was to do was to change the allocation or the distribution of the
settlement proceeds, which had nothing to do with Citgo. . . .  So although time has passed, it's still a
viable settlement agreement in this Court's view.

 

The trial court then
gave preliminary approval to the settlement agreement and severed Citgo out of
the case.  The trial court issued a
formal order to that effect on January 25, 2000, reciting that the court found
the settlement to be "sufficiently reasonable, adequate and fair to
warrant giving notice to members of the Settlement Class . . . ."

On
March 29, 2000, appellees amended their petition to allege for the first time,
as an alternative claim, that Citgo had breached the settlement agreement.  Appellees urged, in addition to the other two
alleged instances of breach, that Citgo had failed to fund the remaining
balance of $5 million due under the settlement agreement within five days of
its preliminary approval by the court.

The
parties exchanged motions for summary judgment, which were each denied on April
25, 2001.  Citgo filed a supplemental
motion to decertify on July 6, 2001, urging that intervening events in the case
and developments in case law, including Southwestern Ref. Co., Inc. v.
Bernal, 22 S.W.3d 425, 435 (Tex. 2000) (requiring a rigorous analysis to
ensure predominance and superiority) precluded the matter from proceeding as a
class action.  








The
parties tried the matter before the court in August 2001 on the breach of
contract claim; an order finding breach issued October 17, 2001. The order
recites, among other things, that (i) Citgo entered into a valid and
enforceable settlement which remained valid and enforceable at all times prior
to Citgo's breach, (ii) Citgo waived any defense it may have had based on the
lack of timely signatures of certain class representatives, (iii) the Plaintiff
Class satisfied all of its obligations under the Settlement, and all conditions
precedent have been met or are excused, (iv) the Court never disapproved or
modified Citgo's settlement but only made recommendations for a plan of
distribution, (v)  the Plaintiff Class
did not waive its claims for breach, and (vi) did not make an election to
abandon its claims for breach, and (vii) Citgo's other defenses and affirmative
defense were without merit. 

The
trial court held a separate hearing on attorneys' fees in February 2002,
followed by another hearing in September 2002 (after providing notice to class
members and an opportunity to be heard) to determine fairness of the settlement
agreement.  Final judgment, finding the
settlement to be fair, adequate and reasonable, and awarding damages in favor
of appellees, issued April 4, 2003.  

Issues on Appeal








Citgo
brings numerous issues on appeal, challenging not only the finding of breach
but also asserting that the settlement agreement was rejected and/or modified
by the court, and/or abandoned and/or waived by appellees prior to the issuance
of the requisite court approval.[19]  Citgo further urges that it was error to
certify the matter as a class action, that common issues do not predominate,
and that the trial court never conducted the requisite vigorous analysis.  Citgo also challenges the award of attorneys= fees.[20]  








Appellees
counter that (1) class certification is a moot issue and not properly under
review by this court, (2) the 1995 class certification was in any event the
result of rigorous analysis by the trial court and satisfied the requisites of
rule 42, (3) the trial court correctly found Citgo liable for breach, and (4)
the trial court did not abuse its discretion in awarding attorneys= fees.  

The Settlement Agreement

"The
public policy of both our state and federal governments favors agreements to
resolve legal disputes through such voluntary settlement procedures."  Jack B. Anglin Co. v. Tipps, 842
S.W.2d 266, 267 (Tex. 1992).  The law
favors settlement of disputes and the prevention of litigation, and therefore
"compromise of doubtful and conflicting rights and claims is not only good
and sufficient consideration to uphold an agreement, but it is highly favored
in law."  McDonough v. First
Nat'l Bank, 34 Tex. 309, 320 (1871). 
"When parties agree to settle their differences, this is commonly
understood as fully resolving those differences."  Gunn Infiniti v. O'Byrne, 996 S.W.2d
854, 860 (Tex. 1999) (citing Herring v. Dunning, 446 S.E.2d 199, 202
(Ga. Ct. App. 1994); Yancey v. Yancey, 55 S.E.2d 468, 469 (N.C. 1949)
("The word 'settle' means 'to place in a fixed or permanent condition; to
determine.'   And the word being used in
connection with litigation must be understood as signifying  that the controversy had been adjusted and
brought to an end.")).  








In
the circumstances of this case, any issue as to whether or not class
certification was proper was necessarily resolved by compromise upon entry into
a settlement agreement.  However, where
proper issues have been preserved and raised on appeal, we may not disregard
the possibility that a party to such an agreement has abandoned or waived his
rights thereunder, by inconsistent conduct or otherwise, effectively
repudiating the agreement.  Further, we
may not fail to evaluate whether, in the instance of a class action, court
approval was given to a still viable agreement as it was written, without
modification (absent all parties' subsequent agreement), or to a different
agreement.  

We
determine that we must first evaluate whether the settlement agreement was
viable at the time and in the same form as approved by the court, before we may
determine whether it was breached.  If
the agreement was viable, the issue of class certification is moot and will not
be addressed, and we will consider breach. 
If, however, the settlement agreement was not viable at the time of
court approval, or was distinct from that ultimately approved by the court,
then breach is no longer an issue, and we may consider whether the requisites
of rule 42 were satisfied, such that class certification was proper.[21]  See Tex.
R. App. P. 42.  

A.  Issues Relating to Viability
of the Settlement Agreement








We
first address (a) two subissues in Citgo's third issue (was the evidence
legally and factually sufficient to support that (i) Citgo entered into a
settlement with the class that was valid and enforceable at all times prior to
Citgo's alleged breach, and (ii) the "Plaintiff Class satisfied all of its
obligations under the Settlement and all conditions precedent have been met or
are excused"), (b) Citgo's fourth issue (did appellees' intentional
conduct inconsistent with claimed rights under the settlement agreement
establish that appellees had waived and/or abandoned any rights or claim
against Citgo under the settlement agreement), and (c) Citgo's fifth issue (was
it against the great weight and preponderance of the evidence to fail to find
that appellees waived any rights or claim against Citgo under the settlement
agreement).  We also address (a) the
subissue in Citgo's first issue (whether the trial court abused its discretion
in approving a class action settlement agreement), and (b) Citgo's second issue
(whether the court approved the settlement agreement actually entered into
between appellees and Citgo, or a "modified settlement to which
Citgo" never agreed).

B. Standard of Review








We
note the underlying matter was tried to the court in a bench trial, with
virtually all facts undisputed.  The
trial court's Order of October 17, 2001, included findings that, as a matter of
law:  (a) Citgo's settlement agreement remained
valid and enforceable at all times prior to Citgo's breach; (b) the trial court
"never disapproved or modified the settlement with the plaintiffs class
but simply made recommendations . . . for a plan of distribution of settlement
proceeds from several settlements with multiple defendants, including
Citgo;" (c) appellees did not waive their claims, and (d) appellees did
not make any election to abandon their claims against Citgo.[22]


A
trial court's conclusions of law are not binding on this Court, and we are free
to make our own legal conclusions.  McAllen
Police Officers Union v. Tamez, 81 S.W.3d 401, 404-05 (Tex. App.BCorpus Christi 2002,
pet. dism'd) (citing Harlingen Irrigation Dist. Cameron County No. 1 v.
Caprock Communications, 49 S.W.3d 520, 530 (Tex. App.BCorpus Christi 2001,
pet denied); Muller v. Nelson Sherrod & Carter, 563 S.W.2d 697, 701
(Tex. Civ. App.BFort Worth 1978, no
writ)). "Conclusions of law are reviewed de novo as a question of law and
will be upheld if the judgment can be sustained on any legal theory supported
by the evidence."  Tamez, 81
S.W.3d at 404-05; Harlingen Irrigation Dist., 49 S.W.3d at 520 (citing Circle
C Child Dev. Ctr., Inc. v. Travis Cent. Appraisal Dist., 981 S.W.2d 483,
485 (Tex. App.BAustin 1998, no
pet.)). A trial court's conclusions of law may not be reviewed for factual
sufficiency, Tamez, 81 S.W.3d at 404, and may be reversed only if they
are erroneous as a matter of law.  Id.
(citing Stable Energy, L.P. v. Newberry, 999 S.W.2d 538, 547 (Tex. App.BAustin 1999, pet.
denied); Hofland v. Fireman's Fund Ins. Co., 907 S.W.2d 597, 599 (Tex.
App.BCorpus Christi 1995,
no writ)).  Incorrect conclusions of law
do not require reversal, provided that the controlling findings of fact support
a correct legal theory.  Tamez, 81
S.W.3d at 405; Stable Energy, 999 S.W.2d at 547.








C.  Viability of the Agreement -
Analysis

In
form, the agreement approved by the trial court in January 2000  is the same agreement entered into by Citgo
in September 1997 and first tendered for approval in October 1997.  Citgo contends, however, that changes in the
posture of the case in the intervening years necessarily impacted the rights
and provisions under Citgo's settlement. 
Citgo urges that the original class structure as set out in the November
1995 certification order, and upon which its settlement was crafted, was
abandoned and no longer viable.  Citgo
further urges that members of the Oak Park Triangle class, as well as some
other members of the North Class in the Hillcrest area, had sold their
properties to Citgo and independently settled and executed releases in favor of
Citgo.  Yet, they remain within the
defined settlement classes as the agreement was approved.













The
facts are unequivocal in establishing that the settlement with Citgo was
executed in September 1997,[23]
it was tendered to the trial court for approval in October 1997, that approval
was not forthcoming, a guardian ad litem was appointed to review fairness of
the settlement, that the ad litem found problems with the settlement and, in
light of comments from the court, worked to craft a network of settlements that
would provide a higher recovery to members of the Oak Park Triangle.  In the meantime, the parties attempted to
renegotiate certain terms to meet concerns of the trial court.  Those modifications were then tendered to the
trial court, and they were also rejected as inadequate.  The fact that the trial court later took the
position that its actions did not "change the settlement agreement"
and "did not modify the money that Citgo was going to give to the
Plaintiffs" does not alter the fact that the trial court never gave
approval to the settlement agreement prior to January 25, 2000.  The court, in its order, asserts that it only
intended to "change the allocation or the distribution of the settlement
proceeds, which had nothing to do with Citgo."  However, it nevertheless did impact Citgo[24]
in that, at the least, preliminary approval of the Citgo settlement was delayed
for more than two years.  The real
problem and complication is that until January 2000, the trial court never
treated the Citgo settlement agreement as a stand-alone agreement independent
of other settlements.   Rule 42
of the Texas Rules of Civil Procedure mandates that the trial court "must
approve any settlement, dismissal, or compromise of the claims, issues, or
defenses of a certified class."  Tex. R. Civ. P. 42(e)(1)(A).  The court must approve the agreement as it is
tendered.  The court may issue such
approval only after a hearing and upon finding that the settlement, dismissal,
or compromise is fair, reasonable, and adequate.  Tex.
R. Civ. P. 42(e)(1)(C).  Until
such mandatory approval is given, a class action may not be dismissed or
compromised, and any such settlement agreement therefore remains contingent
upon that approval.  See Tex. R. Civ. P. 42.

In
the interim time period, significant events altered the landscape.  Citgo subsequently completed the buy-out of
properties in the Oak Park Triangle to which appellees acquiesced.  In so doing, Citgo paid values exceeding
those set out in the settlement agreement, in order to address concerns raised
by both the trial court and the guardian ad litem.  At the time of approval of the agreement,
therefore, the Oak Park Triangle class had already, in majority, released its
claims against Citgo.  

Citgo
urges that during this interim period appellees, by their conduct, either abandoned
or waived, or were estopped to pursue any rights or claims under the settlement
agreement.  

Waiver
has been defined as "intentional conduct inconsistent with the assertion
of a known right."  Bocanegra v.
Aetna Life Ins. Co., 605 S.W.2d 848, 851 (Tex. 1980); CKB & Assoc.,
Inc. v. Moore McCormack Petroleum Inc., 734 S.W.2d 653, 656 (Tex.
1987).  Waiver may be the result of
intentional conduct inconsistent with claiming that right, and may be inferred
from a person's conduct.  Sun
Exploration and Prod. Co. v. Benton, 728 S.W.2d 35, 37 (Tex. 1987); First
Interstate Bank, N.A. v. S.B.F.I., Inc., 830 S.W.2d 239, 248 (Tex. App.BDallas 1992, no writ).








The
doctrine of quasi‑estoppel precludes a party from asserting, to another's
disadvantage, a right inconsistent with a position previously taken by
him.  Stable Energy, L.P. v. Newberry,
999 S.W.2d 538, 548 (Tex. App.BAustin 1999, pet.
denied); Atkinson Gas Co. v. Albrecht, 878 S.W.2d 236, 240 (Tex. App.BCorpus Christi 1994,
writ denied).  The doctrine applies when it would be
unconscionable to allow a person to maintain a position inconsistent with one
in which he previously acquiesced, or from which he accepted a benefit.  Newberry, 999 S.W.2d at 548;  Albrecht, 878 S.W.2d at 242‑43.

Citgo
also contends that appellees, by their intentional conduct inconsistent with
pursuit of the settlement agreement, effected such a delay as to justify Citgo
in believing the agreement had been abandoned, and that, indeed, Citgo relied
upon that conduct and other related communications to its detriment.  








Specifically,
following the court's failure to approve the settlement agreement, appellees
aggressively pursued their claims on the merits, including extensive and
expensive discovery through December 1999. 
They clearly expressed their intent to try the case against Citgo on the
merits.  In November 1998, appellees
delivered a settlement demand for $14,000,000 to resolve the remaining claims;
not only did this demand exceed that provided for in the Citgo agreement, but
it also reflects a position and, under reasonable interpretation, a reasonable
belief that the earlier agreement had been abandoned.  Appellees also filed a motion to decertify
the class.  They tendered and secured
certification of classes differently defined from those in the Citgo agreement
to accomplish settlements with other defendants.  Beyond the one letter sent February 3, 1998,
to which there was no follow-up, appellees made no overt expression in the
intervening timeBin excess of two yearsBthat they intended to
pursue the settlement, and all activity in the case reflected that it had been
abandoned.  Evidence was tendered that
Citgo reasonably relied on appellees' acts and statements to its detriment,
including by proceeding with its buy-out of the Oak Park Triangle at the
enhanced levels recommended by the guardian ad litem (ultimately costing in
excess of $14.8 million (an amount in excess of that provided for in the
settlement agreement), and that Citgo sustained extensive additional expenses
and attorneys= fees in the
intervening time.  

Appellees
contend that they were entitled to pursue alternative claims right up until
trial, including either claims on the merits, or claims for breach of the
settlement agreement (which would dispose of claims on the merits).  We disagree. 
It is certainly true that a claimant may simultaneously pursue
alternative remedies, based upon the same or similar causes of action, and a
claimant may even pursue inconsistent theories of recovery or causes of
action.  However, the thrust of a
claimant's efforts in such circumstances are to seek redress for a wrong.  Upon a perceived breach, as appellees
contended in February 1998, appellees had the option to pursue either a breach
of contract claim on the settlement agreement or to reassert their original
claims on the underlying merits.  Murray
v. Crest Constr., 900 S.W.2d 342, 344 (Tex. 1995) (citing 12 Jaegar, Williston on Contracts ' 1457, at 49 (3d ed.
1970) (when a claim is released for a promised consideration that is not given,
the claimant may either pursue rights under the release, or treat the release
as rescinded and recover on the claim). 
Appellees could not do both.

 








Conclusion

We
conclude that appellees engaged in intentional and, indeed, aggressive conduct
inherently inconsistent with the pursuit of rights under a settlement agreement
that was not approved by the trial court, that Citgo relied upon that conduct
and engaged in alternative acts (including the Oak Park buy-out), with
acquiescence from appellees, that were inherently inconsistent with the
provision of relief exclusively under the settlement agreement, and that
Citgo's conduct was reasonable in the circumstances.  We conclude that appellees are estopped from asserting, to Citgo's disadvantage, rights
inconsistent with positions previously taken by appellees.  We therefore conclude that the settlement
agreement was not viable in January 2000, and could not then have been approved
by the trial court.  Because we reach
this conclusion, we need not reach the remaining issues on appeal.  See Tex.
R. App. P. 47.1.  We reverse and
remand.

ERRLINDA CASTILLO

Justice

 

Opinion delivered and
filed this 

the 30th day of
Septmeber, 2005.                                   











[1] The
order also found class counsel qualified for service and rejected certification
of any class for proposed medical monitoring. 






[2] Citgo argued that conflicts
jurisdiction attached, because the court of appeals' decision conflicted with RSR
Corp. v. Hayes, 673 S.W.2d 928 (Tex. App.BDallas 1984, writ dism'd
w.o.j.).  The supreme court rejected that
view, distinguishing RSR.  See
Coastal Corp. v. Garza, 979 S.W.2d 318, 319, 321-22 (Tex.
1998).





[3] Of the 35 class representatives,
12 had signed the agreement by October 6, 1997; another 10 signed after that
date.  Thirteen never signed the
settlement agreement.  





[4] The settlement is lengthy, and
includes many other protective clauses, contingent upon the happening of
various events.  There are provisions to
secure preliminary court approval, provide notice to and then secure releases
from the entire class, and then obtain final approval from the court.  There are escape provisions if a certain
percentage of property owners elect to opt out of the class.  There are provisions for the set up of
accounts to be used for purchasing the properties, and making payments to class
members.  There are provisions for the
payment of attorneys' fees.  





[5] On October 19, 1997, Citgo filed a
response to plaintiffs' motion for preliminary approval, clarifying that
Citgo's settlement agreement allocated monies to purchase properties "in
connection with the payment of compensatory damages to Property owners and the
payment for purchase of land in the Program Area," and noting that the
Program Protocol Agreement included more detailed specifics.





[6] The formal order issued October
14, 1997. 





[7] Additional sums contemplated in
Citgo's settlement totaled only $5 million.





[8] The ad litem appears to reference
all the settlements together as the "settlement proposal," and does
not consider Citgo's settlement in isolation. 
In particular, he refers to the "initial settlement plan" as
allotting $12,292,758.19 to the Oak Park Triangle," with a "remaining
$17.5 million" "proposed to be distributed as follows: $7.5 million .
. . to residents of Hillcrest and residents of the class area on the south side
of Interstate 37 (again, under these proposed revisions these $7.6 million
dollars would remain untouched), $7.4 million . . . as requested attorneys'
fees, and an additional $2 million was earmarked for reimbursement of attorneys'
expenses."  The sums referenced
obviously exceed those addressed in the Citgo settlement agreement; however,
only monies in the Citgo agreement are dedicated to the Oak Park Triangle and
it is those monies that are challenged as inadequate.  





[9] Settlements had yet to be reached
with three of the defendants; a fourth, Amerada Hess, had agreed "in
principle" to a settlement.  The
letter notes that, at the time the Citgo settlement was negotiated, only three
class representatives did not endorse it; however, other additional class representatives
subsequently elected to withhold their endorsement.  





[10] 
Signed approvals to these revisions of fifteen of the class
representatives are attached to that proposal. 






[11] A draft copy of this document was
forwarded to counsel on December 19, 1997. 






[12] 
The final attachments include three proposed notices to the three new
settlement classes for which certification is sought.  





[13] On December 31, 1997, Citgo filed
a motion with the supreme court requesting that it stay or abate further action
on the pending appeal in light of the potential settlement.  Citgo states this was an effort to preserve
the trial court's jurisdiction which was subsequently withdrawn January 7,
1998. 





[14] 
Language in the agreement continues, by providing that all parties
"agree to seek preliminary approval from the Court of the settlement
embodied in this Settlement Agreement at the hearing scheduled for October 10,
1997, and in the event that hearing does not go forward, as promptly thereafter
as the parties can be heard."  





[15] While is it certainly true that
the various defendants could agree to define settlement classes in whatever
manner they chose, it is also true that if the various settlements are tied
together with respect to distribution of funds, consistency would be required
between those various settlements as to those definitions.  The Citgo settlement was entered prior to the
proposal for the new settlement classes, which are reflected in the later
agreements.  





[16] 
Citgo filed an objection to dissolution in the trial court, urging that
such action not be taken pending the appeal because it would deprive Citgo of
its appellate remedies.  Citgo also filed
an emergency motion for temporary order of stay with the supreme court.





[17] The Residential Class as approved
by this January 1998 order, although differently defined from that set out in
the earlier certification order of the court, encompasses essentially the same
geographical properties, including the Oak Park Triangle.  The Oak Park Triangle is no longer defined as
a separate class.  





[18] Citgo requested that it be
notified immediately if any of the individuals identified as property owners
were then represented by counsel and if any claims for attorneys' fees existed
against any of the respective properties. 






[19] Rule 42 requires that "the
court must approve any settlement, dismissal, or compromise of the claims,
issues, or defenses of a certified class." 
Tex. R. Civ. P.
42(e)(1)(A).   





[20] Citgo's issues on appeal are
framed as follows:

 

1. Following a bench trial, the
trial court rendered judgment that CITGO breached a class action settlement
agreement. It is black letter law that, absent a properly certifiable class
action, class-wide settlements are neither valid nor enforceable.  In light of the predominance, superiority,
and typicality requirements of Rules 42(a) and (b)(4), as well as the
"rigorous analysis" and "trial plan" requirements, did the
trial court abuse its discretion in certifying the claims against CITGO as a
42(b)(4) class action?  Following its
original certification, did the trial court abuse its discretion in (1)
maintaining the claims as a Rule 42(b)(4) class, instead of decertifying them;
(2) approving a class action settlement agreement; and (3) rendering judgment against
CITGO for breach of that agreement?   

 

2. It is also the law that, to be
valid and enforceable, settlement of a class action must first be approved by
the trial court, and the court may only approve (or disapprove) the settlement
actually presented by the partiesBthe court is powerless to approve a modified settlement to
which one of the parties does not consent and impose the modified agreement
upon the unwilling party.  Did the trial
court approve the settlement agreement that Plaintiffs and CITGO actually
presented to the court, or was the "settlement" the court eventually
approved a modified settlement to which CITGO never agreed?

 

3. Is the evidence legally and
factually sufficient to support the following determinations of the trial
court: (a) that CITGO entered into a settlement with the class which was valid
and enforceable at all times prior to CITGO's alleged breach; (b) that CITGO
breached the settlement agreement with the class; (c) that the class satisfied
all of its obligations under the settlement and all conditions precedent were
met or are excused; (d) that the class was damaged in the amount of $5 million
by CITGO's alleged breach? 

 

4. Does the evidence of Plaintiffs'
intentional conduct inconsistent with claiming any rights under the settlement
agreement conclusively prove that Plaintiffs waived and/or abandoned any rights
or claim against CITGO under the settlement agreement?

 

5. Was the trial court's failure to
find that Plaintiffs waived any rights or claim against CITGO under the
settlement agreement against the great weight and preponderance of the
evidence?

 

6. Is the evidence legally and factually sufficient
to support the trial court's award of attorneys' fees to the class in
connection with their breach of contract claim, and/or is the award excessive?





[21] We reject appellees' contention
that this court's prior review of the class certification issue absolutely
precludes us from considering it further. 
The original class certification opinion, Amerada Hess Corp. v. Garza,
973 S.W.2d 667 (Tex. App.BCorpus Christi 1996, pet. dism'd
w.o.j.) ("Garza I"), issued at an early point in the proceedings and
considered only whether the trial court had appropriately assessed and had not
abused its discretion in determining that, at that point in the litigation, the
requisites of rule 42 appeared to have been satisfied.  In addition, the second interlocutory appeal
dealing with the class certification issue, Citgo Refining and Mktg., Inc.
v. Garza, 94 S.W.3d 322 (Tex. App.BCorpus Christi 2002, no pet.) ("Garza II"),
directly addressed a jurisdictional question (whether an order of notice to the
class constituted a fundamental alteration in the nature of the class).  While observations of the court may well be
applicable and appropriate to consider, none of these cases, in our view,
constitute law of the case or preclude us from considering certification
issues, should that be appropriate based upon other findings.  Further, we agree that the requirements of Southwestern
Refining Co. v. Bernal, 22 S.W.3d 425 (Tex. 2000) are appropriately applied
to determine whether class certification is proper.  See State Farm Mut. Auto Ins. Co. v. Lopez,
156 S.W.3d 500, 555-56 (Tex. 2004) (holding that analysis required in Bernal
is properly applied even where certification order issued prior to Bernal).  





[22] We agree that approval of a
settlement in a class action, including the determination of whether it is fair
and equitable, is left to the sound discretion of the trial court, and is not
to be disturbed absent an abuse of discretion. 
Gen. Motors Corp. v. Bloyed, 916 S.W.2d 949, 955 (Tex.
1996).  However, before determining
whether a settlement is fair and equitable, it is necessary to determine whether
the proposed settlement still survives as a viable agreement.





[23] We note that all of the class
representatives never executed the settlement agreement, but no issue as to
this has been raised in this appeal, and appellees contend that any such issue
was, in any event, waived.  





[24] We also note the effects of trying
to craft inter-related settlement agreements in a "global
settlement," where Citgo's settlement was drafted as a stand-alone
agreement, necessarily did impact Citgo's rights under the settlement.  We agree that the proposals would have
altered Citgo's ability to independently determine whether to proceed despite
excessive opt-outs, and they would have inextricabliy intertwined not only
Citgo with other defendants, but also the various classes with each other.