ATKINSON GAS COMPANY and Clifford Atkinson, III, Appellants,

v.

Emmett ALBRECHT & Wife, Dorothy Albrecht, and, Clarence Albrecht & Wife, Sandra Albrecht, Appellees.

No. 13–92–687–CV.

Court of Appeals of Texas, Corpus Christi.

May 12, 1994.

Rehearing Overruled June 9, 1994.

Mayo Galindo, Stewart J. Alexander, San Antonio, for appellants.

Thomas Barry, Yorktown, for appellees.

Before KENNEDY, GILBERTO HINOJOSA and FEDERICO HINOJOSA, Jr., JJ.

## OPINION

KENNEDY, Justice.

Atkinson Gas Company and Clifford Atkinson III (Atkinson) appeal from a judgment in favor of Emmett and Dorothy Albrecht and Clarence and Sandra Albrecht, declaring that Atkinson's oil and gas lease from the Albrechts had terminated due to *cessation of production.* Atkinson raises nine points of error contending that production was excused due to the Albrechts' interference with the well, the *force majeure* provision of the lease, and the payment of shut-in royalties, and challenging the sufficiency of the evi-

dence to support a damage award to the Albrechts. We affirm.

In February 1985, the Albrechts leased to Atkinson the mineral rights to 187.1 acres of land under an oil and gas lease that provided for a one-year primary term "and as long thereafter as oil, gas or other mineral is produced from said land" without cessation of production for a period of more than sixty consecutive days. Atkinson drilled a single gas well on the property from which production continued under the terms of the lease until December 1991.

By that time, Atkinson had grown lax in his business practices due to a lack of administrative assistance and was past due on his payments both to the Albrechts and to his own employee, Lucas Kreitz, a well gauger that he had hired to check the well regularly. Emmett Albrecht and Kreitz therefore determined to get Atkinson's attention by turning off the valve to the gas well and leaving it "shut-in" as of December 9, 1991.[1] They informed Atkinson that the well had thus been shut-in, and Albrecht specifically sent a letter to Atkinson with a notation dated December 9, 1991, indicating that, "the well was shut in today. No Pay—No Gas!" However, Atkinson disregarded this note and assumed that production was continuing at a reduced rate because the pipeline company which purchased the gas erroneously continued to report that it was flowing and to pay for the quantities that it erroneously believed to have been produced from the well.

In the meantime, because Atkinson had for several months fallen behind on his reports of production to the Texas Railroad Commission, due to his asserted lack of administrative help, the Commission issued an order and sealed the gas well in question on January 22, 1992, such that production after that date was physically prevented. *See* 16 Tex.Admin.Code § 3.68 (West 1993) (Tex. R.R.Comm'n, Pipeline Connection and Severance).

Albrecht had begun negotiation for a new lease of the well, and, on March 18, 1992, he requested a release from Atkinson on the

---

1. Kreitz would normally shut-in the well for a day every two weeks in order to build up pressure. He had followed this procedure and shut-in the well on December 8, 1991, after which he and Albrecht determined to leave it shut-in.

ground that the prior lease had terminated by nonproduction for a period in excess of sixty days. Nevertheless, when the Railroad Commission seal was lifted and the well was turned back on as of March 20, 1992, Atkinson continued his attempt to operate the well and to receive the proceeds from production, against Albrecht's protest that the lease had terminated.

Atkinson initially sued the Albrechts for injunctive relief and damages for their refusal to allow him to enter the lease and for shutting in the well. The Albrechts answered, contending that the lease expired according to its own terms because production had ceased for more than sixty days. They also counterclaimed for trespass, slander of title and breach of contract in connection with their loss of a prospective lessee after the termination of Atkinson's lease. The trial court rendered judgment that the lease had terminated, held Atkinson to be a trespasser, and awarded the Albrechts $29,761.53 in damages on their counterclaims.

### Repudiation

By his first point of error, Atkinson contends that the evidence conclusively showed that Albrecht actively interfered with production and prevented him from operating the well by shutting it in.

■ As a general rule, performance is excused when a party to a contract prevents the other party from performing and thereby repudiates the contract. *See Sage Street Associates v. Northdale Construction Co.,* 809 S.W.2d 775, 777 (Tex.App.—Houston [14th Dist.] 1991, no writ); *O'Shea v. International Business Machines Corp.,* 578 S.W.2d 844, 846 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.).

■ Specifically, in the context of an oil and gas lease, repudiation by a lessor relieves the lessee from any obligation to conduct any operation on the land in order to maintain the lease pending resolution of the controversy over the validity of the lease. *Kothmann v. Boley,* 158 Tex. 56, 308 S.W.2d 1, 4 (1957); *Exploracion de la Estrella Soloataria Incorporacion v. Birdwell,* 858 S.W.2d 549, 554 (Tex.App.—Eastland 1993,

no writ); *Humphrey v. Seale,* 716 S.W.2d 620, 623 (Tex.App.—Corpus Christi 1986, no writ); *Cheyenne Resources, Inc. v. Criswell,* 714 S.W.2d 103, 105 (Tex.App.—Eastland 1986, no writ).

However, in order to establish such a repudiation, the lessor must have asserted a clear, unequivocal challenge to the lessee's title to, and interest in the lease. *Cheyenne Resources,* 714 S.W.2d at 105 (lessor posted a sign on the gate to leased premises notifying lessee that lease had expired); *Fike v. Riddle,* 677 S.W.2d 722, 726 (Tex.App.—Tyler 1984, no writ); *Tar Heel Energy Corp. v. Menking,* 621 S.W.2d 450, 451 (Tex.Civ.App.—Corpus Christi 1981, no writ); *Adams v. Cannan,* 253 S.W.2d 948, 951 (Tex.Civ.App.—San Antonio 1952, writ ref'd).

■ In the present case, Albrecht's participation in the December shut-in did not imply that the lease had then terminated. The dispute between the parties at that time did not concern title to the lease but merely the timely payment of royalties. Nor did Albrecht's actions amount to a "lock-out" situation in which Atkinson was physically prevented from entering the lease or obtaining production from the well. *See Caddell v. Threshold Development Co.,* 609 S.W.2d 871, 873 (Tex.Civ.App.—Amarillo 1980, no writ). On the contrary, Atkinson was promptly informed of the shut-in and was generally free to turn the well back on at any time prior to the sealing of the well by the Texas Railroad Commission. Thus, the evidence at most shows merely that Albrecht and Kreitz caused an inconvenience to Atkinson by shutting in the well as a means to get his attention concerning their right to be paid, but such actions failed to rise to the level of preventing Atkinson from producing or repudiating the lease. We overrule Atkinson's first point of error.

### Estoppel

By his second through fifth points of error, Atkinson generally contends that he properly tried and established his defense that Albrecht was estopped from claiming that the lease had terminated.

Atkinson argues that Albrecht's actions in shutting in the well and also in accepting erroneous royalty payments for the shut-in period invoked the doctrine of quasi estoppel. Quasi estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him. The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or of which he accepted a benefit. *Vessels v. Anschutz Corp.,* 823 S.W.2d 762, 765–66 (Tex.App.—Texarkana 1992, writ denied); *Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.,* 817 S.W.2d 160, 164 (Tex.App.—Houston [14th Dist.] 1991, no writ); *El Paso National Bank v. Southwest Numismatic Investment Group, Ltd.,* 548 S.W.2d 942, 948 (Tex.Civ.App.—El Paso 1977, no writ). Thus, quasi estoppel forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid corresponding obligations or effects. *Mexico's Industries, Inc. v. Banco Mexico Somex, S.N.C.,* 858 S.W.2d 577, 581 n. 7 (Tex.App.—El Paso 1993, writ denied); *Turcotte v. Trevino,* 499 S.W.2d 705, 712–13 (Tex.Civ.App.—Corpus Christi 1973, writ ref'd n.r.e.). Moreover, unlike equitable estoppel, quasi estoppel requires no showing of misrepresentation or detrimental reliance. *Vessels,* 823 S.W.2d at 765; *Steubner,* 817 S.W.2d at 164; *El Paso,* 548 S.W.2d at 948.

In the present case, we fail to see how Albrecht's participation in the December shut-in amounted to an inconsistent position with regard to Albrecht's later contention that the lease terminated when Atkinson failed to turn the well back on for over sixty days. Although it may have been improper for Albrecht to inconvenience Atkinson in this manner, it was not inconsistent with Albrecht's subsequent claim that cessation of production for the requisite period terminated the lease. Such conduct does not amount to a ratification, election, acquiescence, or acceptance of benefits, as have traditionally been considered the type of conduct which may form the basis of a claim of quasi estoppel. *See Steubner,* 817 S.W.2d at 164. On the contrary, Albrecht made no indication by the December shut-in that he intended to relieve Atkinson of the obligation to produce in order to keep the lease, and Albrecht's communication to Atkinson that he had shut in the well showed no signs of leniency or acquiescence.

With regard to Albrecht's acceptance of royalty payments which partially covered the period of nonproduction, these payments were made and accepted by Albrecht after he had already made his position clear to Atkinson that he believed that the lease had terminated. Out of the amounts that he received from the pipeline, Atkinson paid royalties of one/fourth to the Albrechts. Accordingly, Albrecht admitted that in April 1992 he received and accepted royalty payments for production in 1991 and January of 1992, though a portion of these payments erroneously included the period of nonproduction.

Though the theory of quasi estoppel does not require detrimental reliance, it still does require that the position or conduct which is the basis for the estoppel have been taken before the assertion of the position sought to be estopped, as the cases speak in terms of a *previous* action and a *subsequent* inconsistent action which is thereby sought to be estopped. *See Vessels,* 823 S.W.2d at 765–66; *Steubner,* 817 S.W.2d at 164; *El Paso,* 548 S.W.2d at 948 (a right inconsistent with a position *previously* taken); and *Mexico's Industries,* 858 S.W.2d at 581 n. 7; *Turcotte,* 499 S.W.2d at 712–13 (*subsequently* taking an inconsistent position). In the present case, Albrecht's conduct in accepting royalty payments occurred after he made clear to Atkinson that he considered the lease to have been terminated due to cessation of production, which position Albrecht has consistently and continuously maintained. The present single instance of accepting a royalty payment a portion of which he was not entitled to, was not sufficient to show that Albrecht had abandoned this position and would be estopped from reasserting it. Therefore, we hold that quasi estoppel was not available to defeat Albrecht's claim that the lease had terminated in the present case.

We overrule Atkinson's second through fifth points of error.

## Shut–In Royalties

By his seventh point of error, Atkinson contends he established as a matter of law that Albrecht's acceptance of payment for the period of nonproduction amounted to shut-in royalties, which the lease provided for as follows:

> If, at any time or times after the expiration of the primary term, all such wells are shut-in for a period of ninety consecutive days, and during such time there are no operations on said land, then at or before the expiration of said ninety day period, lessee shall pay or tender, by check or draft of lessee, as royalty, a sum equal to $10.00 for each acre of land then covered hereby.

However, the erroneous payment of royalties, as discussed in connection with the estoppel claim, did not amount to shut-in royalties such as would keep the lease alive in this case. Atkinson admitted at trial that he did not pay shut-in royalties because he believed that the well was continuing to produce. Moreover, there was no indication that the payments in question were for the amount required by the shut-in royalty clause of the lease. Finally, these payments were made more than ninety days after the well was shut-in and therefore would have been untimely even if considered to be shut-in royalties, which will only extend the lease if timely paid. *See Freeman v. Magnolia Petroleum Co.,* 141 Tex. 274, 171 S.W.2d 339, 341–42 (1943); *Riley v. Meriwether,* 780 S.W.2d 919, 924 (Tex.App.—El Paso 1989, writ denied). Therefore, we reject Atkinson's contention that the erroneous payment of royalties amounted to shut-in royalties for purposes of maintaining the lease. We overrule Atkinson's seventh point of error.

## Force Majeure

By his sixth point of error, Atkinson argues that as a matter of law he was relieved of the duty to produce during the period that the Texas Railroad Commission ordered the well sealed, by virtue of the *force majeure* clause of his lease, which provides as follows:

> Should Lessee be prevented from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations thereon or from producing oil or gas therefrom by reason of scarcity of or inability to obtain or to use equipment or material, or by operation of force majeure, and Federal or state law or any order, rule or regulation of governmental authority, then while so prevented, Lessee's obligation to comply with such covenant shall be suspended, and Lessee shall not be liable in damages for failure to comply therewith; and this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the lease premises; and the time while Lessee is so prevented shall not be counted against Lessee, anything in this lease to the contrary notwithstanding.

The purpose of a *force majeure* clause is to excuse non-performance of lease obligations only when caused by circumstances beyond the reasonable control of the lessee or by an event which is unforeseeable at the time the parties entered into the contract. *Hydrocarbon Management, Inc. v. Tracker Exploration, Inc.,* 861 S.W.2d 427, 435–36 (Tex.App.—Amarillo 1993, no writ). The parties to an oil and gas lease are presumed to have contracted with knowledge of the law and regulations of the Texas Railroad Commission concerning the production of oil and gas. *Id.* at 436; *Hughes v. Cantwell,* 540 S.W.2d 742, 745 (Tex.Civ.App.—El Paso 1976, writ ref'd n.r.e.). Thus, the *force majeure* clause of an oil and gas lease of the present nature is not triggered when the Texas Railroad Commission orders a well shut-in due to the lessee's failure to comply with its regulations, at least when compliance with the regulation is within the reasonable control of the lessee. *See Hydrocarbon Management,* 861 S.W.2d at 436 (well ordered shut-in due to unauthorized overproduction). *Cf. Frost National Bank v. Matthews,* 713 S.W.2d 365, 368 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.) (*force majeure* clause may be implicated when shut-in order resulted from events beyond the present lessee's control).

In the present case, Atkinson's own conduct in failing to timely file production reports with the Commission caused it to order the well sealed. Moreover, although Atkinson sought to explain that his delayed filings were due to his lack of administrative help for a period of time, this does not suggest that it was beyond his control to comply with the requirements of the Commission. We overrule Atkinson's sixth point of error.

By his ninth point of error, Atkinson complains generally for the same reasons raised in the preceding points of error that the trial court erred in finding that the lease had terminated due to cessation of production. Having overruled the Atkinson's other, more specific points of error, we also overrule Atkinson's ninth point of error.

## Lost Bonus

By his eighth point of error, Atkinson contends that there. was no competent evidence to support the damage award based on an $18,710.00 bonus that Albrecht supposedly lost as a result of Atkinson's refusal to release his purported interest in the lease.[2] Specifically, Atkinson argues that the only testimony offered to show the amount of the lost bonus was objected-to hearsay.

Albrecht contends that, although Atkinson initially objected to testimony concerning the intent of the prospective lessee to pay a bonus, Atkinson failed to preserve that objection with regard to subsequent testimony concerning the amount of the prospective bonus.

Albrecht testified without objection that Stallion Oil Company had indicated that it wanted to lease the well, but requested that Albrecht first obtain a release of the prior lease, which Atkinson had refused to provide. John Trosclair, president of the company which is now operating the well, testified that he had worked as a consulting professional engineer for Stallion in the past. When asked by Albrecht's attorney if Stallion contemplated paying Albrecht a bonus, Trosclair

answered that it had. Atkinson promptly made a hearsay objection, which was overruled by the trial court. Trosclair continued to testify that Stallion was interested in buying the lease and was willing to pay a bonus to Albrecht of $100 per acre, or $18,710 for the 187.1 acre lease. Atkinson, however, made no further objection to this testimony concerning the amount of the bonus.

Although under Texas Rule of Civil Evidence 802 hearsay evidence admitted without objection has probative value, when hearsay is admitted over an appropriate objection it has no probative value and should not be considered in evaluating the sufficiency of the evidence. See Texas Co. v. Lee, 138 Tex. 167, 157 S.W.2d 628, 631 (1941); Tempo Tamers, Inc. v. Crow–Houston Four, Ltd., 715 S.W.2d 658, 662 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). Thus, we initially question whether the hearsay objection to Trosclair's testimony was properly preserved.

As a general rule, error in the admission of testimony is deemed harmless if the objecting party subsequently permits the same or similar evidence to be introduced without objection. Richardson v. Green, 677 S.W.2d 497, 501 (Tex.1984). Thus, even though an objection to evidence is properly made, prior or subsequent presentation of essentially the same evidence without objection waives error. Celotex Corp. v. Tate, 797 S.W.2d 197, 201 (Tex.App.—Corpus Christi 1990, no writ); Trailways, Inc. v. Clark, 794 S.W.2d 479, 488 (Tex.App.—Corpus Christi 1990, writ denied).

However, a seemingly contradictory presumption has also been generally accepted that, when a party makes a proper objection to the introduction of certain testimony by a witness and is overruled, he is entitled to assume that the judge will make the same ruling as to other offers of similar evidence, and he is not required to repeat the objection. D.L.N. v. State, 590 S.W.2d 820, 823 (Tex.Civ.App.—Dallas 1979, no writ); Estate

2. The lease specifically obligated Atkinson to make such a release under the following terms:
   Lessee specifically agrees that they will furnish a release of this lease in recordable form within thirty (30) days after the termination of such lease and will, likewise, furnish a partial release in the event of a partial termination within thirty (30) days after such partial termination.

of *Brown v. Masco Corp.,* 576 S.W.2d 105, 107 (Tex.Civ.App.—Beaumont 1978, writ ref'd n.r.e.); *Crispi v. Emmott,* 337 S.W.2d 314, 318 (Tex.Civ.App.—Houston 1960, no writ); *see also Price v. Gulf Atlantic Life Insurance Co.,* 621 S.W.2d 185, 188 (Tex.Civ.App.—Texarkana 1981, writ ref'd n.r.e.). This is particularly true when the party has obtained a running objection concerning similar evidence elicited from the same witness. *See Commerce, Crowdus & Canton, Ltd. v. DKS Construction, Inc.,* 776 S.W.2d 615, 620 (Tex.App.—Dallas 1989, no writ); *Price,* 621 S.W.2d at 188; *see also City of Fort Worth v. Holland,* 748 S.W.2d 112, 113 (Tex.App.—Fort Worth 1988, writ denied).

■ We conclude that the determination of whether a prior objection is sufficient to cover a subsequent offer of similar evidence depends upon a case-by-case analysis, based on such considerations as the proximity of the objection to the subsequent testimony, which party has solicited the subsequent testimony, the nature and similarity of the subsequent testimony as compared to the prior testimony and objection, whether the subsequent testimony has been elicited from the same witness, whether a running objection was requested or granted, and any other circumstances which might suggest why the objection should not have to be reurged.

■ In the present case, Trosclair's subsequent testimony immediately followed the overruling of the hearsay objection, was solicited by Albrecht, merely expanded upon the nature and amount of the bonus, and was clearly referable to, and subsumed under, the original objection based on hearsay. It would therefore seem to be too stringent and formalistic a requirement to hold Atkinson to have waived his objection unless it was immediately reurged. Rather, it is clear in the present case that the considerations of *Crispi* come into play such that Atkinson could assume that the trial judge would have overruled a subsequent hearsay objection to Trosclair's elaboration on the amount of the bonus. We hold that Atkinson's initial hear-

say objection to Trosclair's testimony about the intent to pay a bonus preserved error concerning his immediately following testimony about the amount of that prospective bonus.

■ However, although the objection has been preserved, we conclude that the statements in question were properly admitted into evidence over the objection. Trosclair's testimony concerning the bonus reflects the intent of Stallion Oil Company.[3] Texas Rule of Civil Evidence 803(3) specifies an exception to the hearsay rule for a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health)." Thus, a statement showing the present or future intent of the declarant at the time he made such statement is generally admissible as an exception to the hearsay rule. *See Southern Pine Lumber Co. v. Hart,* 161 Tex. 357, 340 S.W.2d 775, 782–83 (1960); *Reserve Life Insurance Co. v. Goodloe,* 316 S.W.2d 443, 446 (Tex.Civ.App.—Waco 1958, writ ref'd n.r.e.); *see also Trucker's Equipment, Inc. v. Sandoval,* 569 S.W.2d 518, 522 (Tex.Civ.App.—Corpus Christi 1978, no writ). Therefore, in the present case, Trosclair's testimony was properly received to prove the amount of the contemplated bonus which Stallion intended to pay Albrecht for the lease. We overrule Atkinson's eighth point of error.

We AFFIRM the judgment of the trial court.

---

**3.** We note that Atkinson did not seek to question the witness on the basis for his knowledge of Stallion's intent to pay the bonus. Therefore, we must assume that Trosclair had direct knowledge of Stallion's intent as expressed by some individual with the authority to express such an intent on behalf of the company.