

# IN THE
# TENTH COURT OF APPEALS

### No. 10-21-00309-CV

**DICK B. SIMMONS AND JULIE M. SIMMONS,**

                                                    **Appellants**

 **v.**

**WHITE KNIGHT DEVELOPMENT, LLC**

                                                    **Appellee**

From the 361st District Court
Brazos County, Texas
Trial Court No. 18-001344-CV-361

## MEMORANDUM OPINION

The trial court properly applied the doctrine of quasi estoppel in this real estate

contract dispute.  Further, the trial court did not abuse its discretion when it awarded

White Knight Development, LLC specific performance of the contract.  However, because

White Knight could not obtain a judgment for specific performance of the real estate

contract and at the same time also obtain a judgment for damages for breach of that

contract, we modify the judgment of the trial court to delete the damage award of

$308,136.14.  Otherwise, we affirm the judgment of the trial court.

**THE CASE**

At the heart of this case lies the doctrine of quasi estoppel.

"Quasi estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) (citing *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App.—Corpus Christi 1994, writ denied)). "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Id.* One cannot accept the benefits of a transaction and later take an inconsistent position so that he might avoid "corresponding obligations or effects." *Atkinson Gas*, 878 S.W.2d at 240. The party who asserts the application of quasi estoppel bears the burden of proof on the issue. *Jamison v. Allen*, 377 S.W.3d 819, 823 (Civ. App.—Dallas, 2012, no pet.). A party who relies upon the doctrine of quasi estoppel is not required to show either detrimental reliance *or* that the other party has made misrepresentations. *Forney 921 Lot Dev. Partners I, L.P. v. Paul Taylor Homes, Ltd.*, 349 S.W.3d 258, 268 (Tex. App.—Dallas 2011, pet. denied).

White Knight sought to purchase property from Dick B. and Julie M. Simmons. White Knight claims that throughout the transaction, the Simmonses maintained, through words, actions, and writings, the property was subject to restrictions. The Simmonses claim they had consistently maintained there had never been valid restrictions against the property while they had owned it. White Knight asserts the

Simmonses cannot, under the doctrine of quasi estoppel, first take the position that there are restrictions affecting the property and then later claim there never were any restrictions affecting the property while they owned it.

*The Evidence*

In order that we might fully discuss the application of that doctrine, we must examine, in some detail, the evidence presented to the trial court.

The property that is the subject of this appeal is in Bryan, Texas, in the Beverley[1] Estates subdivision. By written instrument signed on December 3, 1938, I.P. and Martha Cooper and Beverley Estates Corporation, dedicated the Beverley Estates subdivision in accordance with a plat attached to the dedication. The instrument contained multiple restrictions that applied to all lots in the subdivision. By the terms of the dedication, Beverley Estates Corporation had the authority to enforce the restrictions.

Among other restrictions not relevant here, no house or structure could be placed upon property within Beverley Estates unless the plans and specifications were approved by Beverley Estates Corporation and "conform[ed] to the layout and general arrangement of the area." The restrictions also contained set-back provisions and restrictions as to the number of dwellings that could be placed on certain-sized tracts.

The 1938 restrictions, stipulations, and conditions were to be effective until January 1, 1954. However, "at any time within two years of such date the then owners of

---

[1] The parties and the evidence also spell the name of the subdivision as *Beverly Estates*. The majority of the references to the subdivision is to *Beverley Estates*. We use the spelling of the majority of the references.

Simmons v. White Knight                                                                 Page 3

more than one-half of the square-foot area of said Estates" could, by majority vote, extend, renew, amend, or abolish the restrictions, stipulations, and conditions, or any one of them. As provided in the document by which the parties created Beverley Estates, voters were allowed one vote for each one thousand square feet of land owned in Beverley Estates. What we will call the two-year grace period to renew the restrictions would have expired on January 1, 1956.

Owners in Beverley Estates subsequently voted to extend the restrictions, stipulations, and conditions, but they did not take that vote until May 7, 1956. The vote was to extend the restrictions until May 7, 1986.

Appellant Dick B. Simmons holds a PhD and is a professor emeritus at Texas A&M University. Dr. Simmons was employed by Texas A&M from 1970 until he retired in 2007. He ran the statewide computer network system from 1972 until 1980 when he began to work in the computer science and software engineering programs at Texas A&M.

On August 8, 1985, Dr. Simmons and his wife, Julie M. Simmons, bought the property that is the subject of this appeal from Interstate Promotional Printing Company. Interstate, as a part of the purchase price, retained a lien upon the property. The Simmonses signed an agreement with Interstate in which the Simmonses agreed that, as long as the note had not been paid, they "would refrain from and not consent to, approve, and/or execute any renewals and/or extensions of the covenants and restrictions of the

Beverly (sic) Estates Subdivision *now existing* against the property…which may be up for renewal and/or extension in the future or approve, consent, or execute and deliver any instruments or documents which would place any covenants, declarations and/or restrictions against the property...." (Emphasis added).

The Simmonses also agreed that they would "refrain from and not consent to, approve, and/or execute any renewals and/or extensions of any covenants and restrictions *now existing* against the property…including, but not limited to…" the 1938 restrictions and the 1956 restrictions; record references were made to other documents. (Emphasis added).

On November 21, 1985, shortly after the Simmonses had purchased the property, various owners of property in Beverley Estates voted to extend the restrictions until January 1, 2016, with the same grace period provision—that the restrictions could be extended if voters elected to do so by January 1, 2018. The renewed restrictions provided that any construction plans were now to be approved by Beverley Estates Home Owners Association. The renewal also contained a provision that restrictions, stipulations, and conditions could be renewed by the majority vote of the "owners of more than one-half the acreage of Beverley Estates[.]" The restrictions, stipulations, and conditions now provided that any meeting for such purpose was to be held in a public place; the "whites only" provision no longer appeared in the restrictions.

The Simmonses did not attend that meeting because they were out of town.

However, on November 25, 1985, Dr. Simmons wrote a letter to Edward Madeley in connection with the meeting. In his letter, Dr. Simmons acknowledged receipt of Madeley's letter regarding the renewal of restrictions. In Dr. Simmons' letter, he explains that when he purchased his property, he had agreed he would not vote to approve any renewals or extensions of any restrictions then existing against the property. Even though he acknowledged he could not vote to renew or extend the restrictions then existing against the property, he offered to try to persuade Wayne Smith to approve the restrictions. Wayne Smith is apparently associated with Interstate Promotional Printing Company, the Simmonses' grantor and lienholder.

The Simmonses later decided to sell a portion of their property and keep another part of the property upon which their house was located.

White Knight was in the construction business and had developed, built, and sold townhouses in the area and was interested in purchasing the Simmonses' property; it wanted to construct townhouses on the property.

White Knight principals, Roy Howard Mundy and Ryan Strickland, met Dr. Simmons at the property. Dr. Simmons was aware of the purpose for which White Knight wanted to purchase the property. He was familiar with other townhouse projects White Knight had completed in the area.

Mundy testified that Dr. Simmons showed Strickland and him around the property. He also gave them copies of various documents, including a copy of the 1985

restrictions. Dr. Simmons explained to them that when he built his swimming pool, he had to redesign the pool area to comply with those restrictions. They also discussed the fact that the 1985 restrictions were set to expire on January 1, 2016, but that owners in the subdivision could renew them if they voted to do so by January 1, 2018.

In October 2015, after a time of negotiation, the Simmonses and White Knight signed a "SALES CONTRACT" whereby the Simmonses agreed to sell a portion of their Beverley Estates property to White Knight. The agreed-upon price was $400,000. The property is described in the contract as "1.1 acres +/- .15 acres of Lot 60 adjacent to Café Eccell, Beverley Estates Addition, City of Bryan, County of Brazos Texas, known as 1.1 acre vacant lot at 713 Rosemary Drive 77802." White Knight paid the Simmonses $5,000 for the right to terminate the contract by notifying the Simmonses of their intent to do so before April 8, 2016. The fee for this termination option was to be credited against the purchase price at closing. The closing date was to be May 9, 2016.

Mundy testified that title company personnel indicated to White Knight they would not insure against the restrictions even if current restrictions expired on January 1, 2016.

During the option period, Mundy told Dr. Simmons that White Knight was not going to buy the property because of the risk that the restrictions might be valid. White Knight became concerned that its intended use of the property—construction and sale of townhouses—could be in violation of the set-back provisions and provisions relative to

the number of dwellings that could be placed on tracts within Beverley Estates, if those deed restrictions had been properly extended and were indeed still valid. Of further concern was the question of whether the requirement that plans and specifications must be approved by the Beverley Estates Home Owners' Association remained effective.

Mundy told Dr. Simmons that White Knight wanted to cancel the contract and get its earnest money back.

There is evidence in the record that it was Dr. Simmons who proposed a solution whereby they would agree to buy the property back if owners in the subdivision voted to reinstate the restrictions before January 1, 2018. The parties agreed to extend the option period to allow time to prepare such an agreement.

On April 15, 2016, the parties amended the sales contract. By the terms of this amendment, the Simmonses agreed "that if any of the Restriction concerns…are reinstated at any time prior to January 1, 2018," White Knight had the option to demand that the Simmonses buy the property back. The Simmonses were to repurchase the property within 45 days of the date that White Knight requested them to repurchase the property. The repurchase price was $400,000 (the original purchase price).

On May 24, 2016, the parties closed the deal. Although the Simmonses were to originally finance part of the purchase price, a bank ultimately financed the transaction. White Knight paid the Simmonses the full price and received a deed to the property.

The record contains testimony that Dr. Simmons told the White Knight principals

he did not believe the HOA members would get back together and have enough favorable votes to renew the restrictions. Dr. Simmons also indicated there had already been a vote, it had failed, and another vote would fail as well.

The HOA held a meeting on October 25, 2016. Those persons voting voted to extend the restrictions, stipulations, and conditions until January 1, 2046. Dr. Simmons was present at that meeting. He signed what he thought was a sign-in sheet; it was not. It was the means whereby Beverley Estates owners could cast their vote to extend and amend certain provisions of the restrictions. When Dr. Simmons discovered the true purpose of the sheet, he marked through his name and wrote, "Disapprove."

There was yet another meeting of the HOA on December 27, 2016. At that meeting, the vote was to reinstate the restrictions and to amend them to provide, in relevant part, that lots in Beverley Estates could not be "subdivided, replatted or amended so as to create a new or additional lot or tract based on the configuration, use or ownership."

White Knight began to have conversations with Dr. Simmons regarding his need to perform the buy-back agreement. Mundy testified that Dr. Simmons told him the Simmonses would repurchase the property, but they had paid off the mortgage on their house with the money they had received from White Knight and would not have the money to buy the property back until they sold their house. Dr. Simmons told White Knight it should just build something else. The Simmonses later sold their house, but they did not pay White Knight.

Dr. Simmons began to claim that the vote to extend, amend, or reinstate the 1985 restrictions was not proper. Randall Haynes, Senior Planner and Historic Preservation Officer for the City of Bryan, testified that he and Dr. Simmons discussed the restrictions as well as the zoning classification pertaining to the property. Haynes computed the number of votes cast in 2016 in favor of the extension or reinstatement of the 1985 restrictions differently from Dr. Simmons' computation. The record contains several emails between Dr. Simmons and Haynes regarding the computations. By Haynes' calculation, the votes in favor of the extension, amendment, or reinstatement represented over fifty percent of the property in Beverley Estates. Dr. Simmons disagreed. It would seem, at this point, Dr. Simmons' contention that the vote count was improper under the 1985 restrictions would be some evidence that the Simmonses continued to recognize the validity of the restrictions.

On November 8, 2017, White Knight sent a letter to the Simmonses. In that letter, White Knight outlined its concerns that the restrictions had been validly renewed or reinstated and amended before January 1, 2018, and would effectively prohibit White Knight from engaging in its proposed project. White Knight made demand upon the Simmonses to perform the buy-back agreement.

In response to White Knight's demand, the Simmonses' attorney informed White Knight that the Simmonses were not going to repurchase the property.

At this point, the Simmonses took the position, basically, that none of the renewals

after expiration of the 1938 restrictions were effective either because they were untimely or because the votes were improperly tabulated or because voting took place at the wrong location. The essence of the position taken by the Simmonses was that there were no valid restrictions applicable to the property.

### *The Lawsuit and Result*

When the Simmonses declined to perform under the buy-back agreement, White Knight sued them for specific performance, breach of contract, and fraud in the inducement of the real estate contract.

After it had held a bench trial, the trial court entered a judgment wherein it specifically ruled that, under the doctrine of quasi estoppel, the Simmonses were prohibited from asserting there were no valid restrictions relative to the property. In its judgment, the trial court ordered the Simmonses to specifically perform the buy-back provision. Additionally, the trial court assessed "additional actual damages/ consequential damages" against the Simmonses in the amount of $308,136.14.

The trial court also assessed trial attorney's fees against the Simmonses in the amount of $72,796.79. Additionally, it assessed conditional appellate attorney's fees. Finally, the trial court assessed court costs, pre-judgment interest, and post-judgment interest against the Simmonses. The Simmonses appeal from that judgment.

White Knight has also appealed from the trial court's judgment and contends the trial court erred when it failed to enter judgment in favor of White Knight on its fraud

claim against the Simmonses.  In its judgment, the trial court did not address White Knight's fraud claim but did state, "This is a FINAL JUDGMENT.  This judgment finally disposes of all claims and parties and is a final, appealable judgment."

**THE SIMMONSES' APPEAL**

The Simmonses present us with five issues on appeal.  We first dispose of their fifth issue on appeal which relates to the alleged failure of the trial court to file findings of fact and conclusions of law on the breach of contract action.  The trial court did file findings of fact and conclusions of law.  Accordingly, we overrule the Simmonses' fifth issue on appeal.

The Simmonses have stated the remaining issues on appeal differently in the "Issues Presented for Review" section of their brief than in the argument section of their brief.  Because citations to authority and the Simmonses' arguments appear in the argument portion of the brief, we will address the issues as set forth in the argument section.

*Quasi Estoppel*

In their "Point One," the Simmonses maintain that "[w]ithout any evidence, the trial court in its judgment found that quasi estoppel prevented the Simmons family from making an argument that the 1956 and 1985 attempted renewals were void."

The argument portion of the Simmonses' brief contains a "Point One A."[2]  In that

---

[2] Just to be clear, there is no "Point One B."

point, the Simmonses single out one element of the doctrine of quasi estoppel and contend there was "insufficient evidence that the Simmons family ever took a contrary position on the question of whether the 1938 deed restrictions had ever been renewed." Based upon a reading of the point, we take the Simmonses' argument to be a no evidence complaint.[3]

In "Point Two," as set out in the argument section of the brief, the Simmonses claim the reinstatement of the restrictions before January 1, 2018, was a condition precedent to enforcement of the buy-back agreement, and because White Knight failed to prove the restrictions were reinstated, the buy-back provision was never triggered.

We believe "Point Three," as noted in the argument section of the Simmonses' brief, is related to "Point Two:" that being, "…the Simmons family did not have to do anything unless the 'Restriction concerns are reinstated prior to January 1, 2018.'"

The Simmonses' argument in support of "Point One" and "Point One A" seems to be that there is no evidence of any of the elements of the doctrine of quasi estoppel, and therefore, White Knight failed to meet its burden on the quasi-estoppel issue. Therefore, in effect, the Simmonses contend there is no evidence that they had maintained an inconsistent posture throughout this entire transaction, or that they acquiesced or benefitted from a position inconsistent with their position, or that they had knowledge of the material facts at the time they executed the amendment to the sales contract.

---

[3] We do not read the Simmonses' brief to contain any complaint as to the factual sufficiency of the evidence.

In our consideration of the Simmonses' "Point One" and "Point One A," we think it is important to note that the issue presented is not whether any restrictions were valid or invalid, timely or untimely renewed, or properly or improperly voted upon. The Simmonses did not frame their issue in that fashion. Rather, the issue, as framed by the Simmonses, is whether the trial court, with no evidence to support it, erroneously applied the quasi-estoppel doctrine to preclude them from taking the position that there were no valid restrictions in existence affecting the property.

Although in "Point Two" and "Point Three" the Simmonses address conditions precedent, we believe the doctrine of quasi estoppel, if supported by the evidence, is applicable to those points as well as to "Point One" and "Point One A."

On one side of the quasi-estoppel coin in this case, the Simmonses maintain they consistently held the same position throughout the entire White Knight transaction: there were no valid restrictions that burdened the property. That theme undergirds the first four "Points" the Simmonses bring to this appeal.

Contrarily, White Knight argues that throughout the transaction, the Simmonses, either explicitly or by their actions, took the position that there were valid restrictions against the property, there was a possibility the restrictions set to expire in 2016 could be extended, and, if they were, the Simmonses agreed to repurchase the property. White Knight claims that when the Simmonses refused to honor the buy-back agreement, the Simmonses then began to claim that, after the 1938 restrictions expired on January 1, 1954,

there were no valid restrictions applicable to the property.

White Knight argued that the doctrine of quasi estoppel prevented the Simmonses from taking the position that there were no valid restrictions affecting the property when, throughout the transaction, they had taken the opposite position. The trial court agreed with White Knight.

We review a trial court's findings of fact in a bench trial for legal sufficiency under the same standards we use to review the verdict of a jury upon jury questions; they have the same force and effect. *Anderson v. Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *Hitzelberger v. Samedan Oil Corp.*, 948 S.W.2d 497 (Tex. App.—Waco 1997, pet. denied).

Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the decision under review. *W & T Offshore, Inc. v. Fredieu*, 610 S.W.3d 884, 898 (Tex. 2020) (citing *City of Keller v. Wilson*, 168 S.W.2d 802, 827 (Tex. 2005)). We must review the evidence in the light most favorable to the verdict, crediting any favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.2d 802, 807, 827 (Tex. 2005). We must uphold the factfinder's verdict if there is more than a scintilla of evidence to support the judgment. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

We will sustain a challenge to the legal sufficiency of the evidence only if (1) there is a complete lack of evidence of a vital fact, (2) rules of law or evidence bar the court

from giving weight to the only evidence offered to prove a vital fact, (3) there is no more than a scintilla of evidence offered to prove a vital fact, or (4) the opposite of the vital fact is conclusively established. *Pike v. Tex. EMC Mgmt., LLC,* 610 S.W.3d 763, 783 (Tex. 2020) (citing *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004)).

In the trial court, the Simmonses wanted to assert that the attempted renewals or reinstatements of the 1938 deed restrictions in 1956 and 1985 were invalid and that there were no deed restrictions on the property either when they bought it or thereafter. As we have said, the trial court found that the doctrine of quasi estoppel prevented the Simmonses from asserting the "reinstatements/renewals/amendments in 1956 or 1985 were not valid or making an argument that the same were/are void."

There is ample evidence that, throughout the transaction, the Simmonses consistently acted as though the restrictions were applicable to the property. The record contains evidence that Dr. Simmons, when he first showed the property to the White Knight principals, told them about how he had to design his pool in accordance with the Beverley Estates restrictions. He also gave them a copy of the restrictions.

The record also reveals testimony that when the Simmonses bought the property, they acknowledged in writing that they would not vote to approve any renewals or extensions of any restrictions *then existing* against the property. That is some evidence the Simmonses believed there were restrictions *then existing* which burdened the property. The evidence also shows that Dr. Simmons wrote to the apparent leader of

Beverley Estates explaining that the Simmonses could not vote for the renewal and extension of the 1956 restrictions because they had agreed not to. Dr. Simmons did offer to get another person, perhaps related to the Simmonses' grantor and lienholder, to vote for the restrictions. We see this as some evidence that Dr. Simmons acknowledged the existence of the restrictions.

Dr. Simmons attended the meeting of the HOA that was held to vote on extending the restrictions that were to expire in 2016. He signed his name to what he thought was a sign-in sheet. When he discovered it was a vote for the renewal and extension of those restrictions, he marked through his name and wrote, "Disapprove." At this point, it appears that Dr. Simmons continued to operate as though he believed the restrictions were valid and applicable to the property.

Subsequently, Dr. Simmons continued to argue that the vote for the renewal and amendment of the restrictions was improper. Again, this is some evidence that the Simmonses acknowledged and believed the restrictions remained effective against the property. We tend to wonder why the Simmonses would insist upon the proper application of voting rules contained in restrictions they believed were invalid and of no effect. Dr. Simmons testified that he was simply trying to help White Knight out when he made arguments regarding the validity of the votes.

Dr. Simmons explained that when he signed the addendum to the contract with White Knight, he knew the addendum contained false statements relative to restrictions,

and he thought at the time there were no valid restrictions against the property. He testified that he signed the addendum anyway because he knew that if he did not sign it, White Knight would not buy the property.

Although Dr. Simmons essentially testified he had always taken the position there were no valid restrictions affecting the property, the trial court, as factfinder, was the sole judge of the credibility of the witnesses and the weight to be given to the testimony.

When we review the evidence we have outlined in the light most favorable to the verdict, we hold the evidence supports the findings and judgment of the trial court regarding the applicability of the doctrine of quasi estoppel relative to breach of contract and specific performance.[4] Because the evidence supports the finding that the Simmonses were estopped from arguing the validity of the restrictions, we overrule issues I, II(a), II(b), and III (Point One, Point One A, Point Two and Point Three).

### *Specific Performance and Damages*

In the "Issues Presented for Review" section of their brief, the Simmonses argue in Issue IV that "[i]t was improper to award damages for breach of contract in addition to specific performance against the Simmons Family, even if the 1938 deed restrictions had been renewed." In "Point Four" of the argument portion of the Simmonses brief, they complain that the trial court erred when it awarded both compensatory damages and specific performance. In "Point Four B," the Simmonses make the argument that specific

---

[4] In its judgment, the trial court did not address the validity of any of the restrictions. No other property owners in Beverley Estates were parties to this lawsuit.

performance is an alternative remedy for breach of contract, not one in addition to a monetary award. Under "Point Four A" in the argument section of the brief, the Simmonses complain that White Knight could not obtain specific performance because it did not tender a deed by which it conveyed the property back to the Simmonses and it did not prove it was ready, willing, and able to do so.

"Specific performance is an equitable remedy that may be awarded for breach of contract." *Pathfinder Oil & Gas, Inc. v. Great Western Drilling, Ltd.*, 574 S.W.3d 882, 887 (Tex. 2019). Before a party may obtain the remedy of specific performance, the party seeking that relief must plead and prove it was ready, willing, and able to timely perform its obligations under the contract. *DiGiuseppe v. Lawler*, 269 S.W.3d 588, 593 (Tex. 2008). *See also Pathfinder Oil & Gas*, 574 S.W.3d at 890.

Although White Knight did not use the words "ready, willing, and able" in its pleading, it pleaded in its Second Amended Petition that "[a]ll conditions precedent to Plaintiff's *claims for relief* have been performed, have occurred or have been waived by Defendants." (Emphasis added). White Knight specifically sought, among other things, relief in the form of specific performance. Its allegation that conditions precedent to its *claims for relief* had been performed is sufficient as a pleading to show it was ready, willing, and able to perform its part of the agreement.

Generally, the party seeking relief in the form of specific performance must make an actual tender of performance. *DiGiuseppe*, 269 S.W.3d at 594. However, when a party

refuses to perform or repudiates a contract, the opposing party may be relieved from actual tender of performance and merely "plead that performance would have been tendered but for the defendant's breach or repudiation." *Id.* In this case, any tender would have been a futile and useless act in view of the Simmonses' plainly stated intention not to abide by the agreement.

In any event, this case presents itself in an unusual posture. The original buyer is now in the position of a grantor of the property, and the original seller of the property is now in the shoes of a grantee. The contemplated obligation of the Simmonses is now to pay White Knight and the obligation of White Knight is to furnish a deed. The buy-back price called for the payment of the purchase price stated in the contract, $400,000. There are no provisions that call for financing, and we therefore assume the re-purchase price was to be paid in cash. "A 'cash sale' is a sale conditioned on payment concurrent with delivery [of a deed] and not a sale on credit." *First Fed. Sav. & Loan Asso. v. Sharp*, 347 S.W.2d 337, 341 (Tex. Civ. App.—Dallas 1961), *aff'd*, 359 S.W.2d 902 (Tex. 1962). Obviously, according to the evidence, the Simmonses had made it clear they were not going to tender the purchase price. Under the evidence, the tender of a deed would have been useless and is, therefore, excused. We overrule "Point Four A" under Issue IV.

In "Point Four B" under Issue IV, the Simmonses contend that White Knight cannot obtain relief in the form of specific performance and at the same time also obtain a judgment for damages for breach of contract. They contend that because the trial court

made no findings of fact or conclusions of law, it is not possible to tell whether the trial court found that the Simmonses breached the contract.

As we have noted earlier in this opinion, the trial court did, in fact, enter findings of fact and conclusions of law. Those findings and conclusions were submitted to it by White Knight. In Finding of Fact 41, the trial court found that the Simmonses failed to repurchase the property and breached "the promise [they] made to [White Knight]." In Conclusion of Law 59, the trial court concluded: "Defendants breached [the] contract." In Conclusions of Law 60, 61, and 62 the trial court referenced that breach.

In its Findings of Fact, the trial court found, among other things, "that as a result of Defendants (sic) breach of contract, Plaintiff is entitled to:" specific performance of the buy-back agreement, including the payment of $400,000 from Defendants to Plaintiff. The trial court also found that White Knight was entitled to recover "[a]dditional actual *damages*/consequential *damages* in the amount of $308,136.14…." (Emphasis added). The trial court also made specific findings as to various items of *damages* that it included in the total amount of *damages* awarded to White Knight.

In its Conclusions of Law, the trial court concluded, in part, that "Plaintiff was damaged as a result of Defendants' breach of contract," and that "Defendants are jointly and severally liable to Plaintiff for breach of contract." Further, the trial court concluded that, "Plaintiff is entitled to and awarded specific performance, actual damages/consequential damages[], reasonable and necessary attorney's fees, costs of

court; pre-judgment interest; and post-judgment interest *as a result of Defendants* (sic) *breach of contract*." (Emphasis added).

Generally, one who sues for breach of contract involving the sale of real estate must elect to seek either money damages for breach of contract or specific performance of the agreement. *See Davis v. Luby*, No. 04–09–00662–CV, 2010 Tex. App. LEXIS 6501, *8 (Tex. App.—San Antonio Aug. 11, 2010, no pet.) (mem. op.). Specific performance is not a separate cause of action; it is one of the remedies that a party might choose to seek in a suit for breach of contract and that may be awarded at the trial court's discretion upon proof of breach. *See Paciwest, Inc. v. Warner Alan Properties, LLC, et al.*, 266 S.W.3d 559, 571 (Tex. App.—Fort Worth, 2008, pet. denied). "[T]he relief associated with specific performance may include monetary compensation in narrow circumstances—when it is deemed necessary to place the parties in the same position as if the contract had been performed …." *Davis*, 2010 Tex. App. LEXIS 6501 at *9 (citing *Heritage Hous. Corp. v. Ferguson*, 674 S.W.2d 363, 366 (Tex. App.—Dallas 1984, writ ref'd n.r.e.)).

The monetary compensation that is awarded by a trial court in connection with a judgment for specific performance is not classified as an award of damages for breach of contract, but rather is classified as an award incident to a decree for specific performance. *Heritage Hous. Corp.*, 674 S.W.2d at 365. The reasoning behind the award "'is that the contract is being enforced retrospectively and the equities adjusted accordingly.'" *Id.* (quoting *Johnson v. Downing & Wooten Constr. Co.*, 480 S.W.2d 254 (Tex. Civ. App.—

Houston [14th Dist.] 1972, no writ)). In such an instance, "the court will enforce the equities of the parties in such a manner as to put them as nearly as possible in the position they would have occupied had the conveyance been made when required by the contract." *Id*. at 366.

However, there is no indication in the findings or judgment that the amounts the trial court awarded to White Knight were to adjust the equities so that the parties were put in the position in which they would have been had the transaction been closed as contemplated. We cannot find anywhere that the trial court made the monetary award as an equitable award. Rather, the trial court specifically found, "as a result of [the Simmonses'] breach of contract, [White Knight] is entitled to…[a]dditional actual damages/consequential damages in the amount of $308,136.14…." The trial court then detailed the facts supporting the individual "actual damages/consequential damages."

Similarly, in its Conclusions of Law, the trial court concluded that the Simmonses breached the contract, White Knight was damaged as the result of that breach, and the Simmonses were jointly and severally liable to White Knight for that breach.

We have found nothing in the Findings of Fact, Conclusions of Law, or the record, to indicate the monetary award to White Knight was made to adjust the equities so that the parties were put in the position in which they would have been had the transaction been closed as contemplated; that would have been permissible. However, White Knight cannot receive relief in the form of specific performance of the contract and then also

receive damages for its breach.

We sustain that part of "Point Four B" under Issue IV wherein the Simmonses complain about the award of "actual damages/consequential damages" in the amount of $308,136.14. We modify the judgment of the trial court to delete that award as well as any award of pre-judgment or post-judgment interest on that amount. In all other respects, we overrule "Point Four B."

## WHITE KNIGHT'S APPEAL

In one issue, White Knight also complains of the trial court's judgment. White Knight maintains the trial court erred when it did not rule in White Knight's favor on its fraud in a real estate transaction claim against the Simmonses and award it additional damages.

In its brief on the issue, White Knight alleges the Simmonses "made a false promise and/or Simmons made a false representation of a fact and/or benefited by not disclosing that a third party's representation or promise was false." White Knight does not refer us to the specific representations made by the Simmonses, or perhaps some third party, about which they complain. The use of the "and/or" language in White Knight's Cross Appellant's brief makes it difficult to determine to which of the many statements in this record White Knight refers, if indeed that is a task properly assigned to us. Because White Knight has not shown us to which statements it refers, how those statements induced it to go through with the transaction, and how those statements were false, we overrule

White Knight's sole issue in their cross-appeal. *See* TEX. R. APP. P. 38.1(i).

**CONCLUSION**

Having sustained only part of "Point Four B," we modify the judgment of the trial court to delete the award of $308,136.14 damages for breach of contract as well as any award of pre-judgment or post-judgment interest on that amount. Otherwise, we affirm the judgment of the trial court.


                                        JIM R. WRIGHT
                                        Senior Chief Justice


Before Chief Justice Gray,
        Justice Johnson,
        and Justice Wright[5]
Affirmed as modified
Opinion delivered and filed August 30, 2023
[CV06]



---

[5] The Honorable Jim R. Wright, Senior Chief Justice (Retired) of the Eleventh Court of Appeals, sitting by assignment of the Chief Justice of the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. §§ 74.003, 75.002, 75.003.